# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

FILED - USDC - NH
2021 DEC 14 PM3:29

**WAYNE P. SAYA, SR**
*Plaintiff, pro se*

*VS.*

**JAMES W. DONCHESS**, in his official capacity as
Mayor of the City of Nashua, New Hampshire, his
agents, successors and employees;

**LORI WILSHIRE**, in her official capacity as
President of the Nashua, New Hampshire
Board of Alderman, her agents, successors and
employees;

**ANGELA CONSENTINO**, individually and as
Third-party contractor Epidemiologist for the City of
Nashua, New Hampshire, Division of Public Health
and Community Services;

**CHRIS SUNUNU**, in his official capacity as
Honorable Governor of the State of New Hampshire,
his agents, successors, and employees;

**LORI SHIBINETTE**, in her official capacity as
Commissioner for the Hampshire Department of
Health & Human Services, her agents, successors and
employees, and,

**BENJAMIN P. CHAN, MD, MPH**, individually
and in his official capacity as State Epidemiologist
and Medical Doctor for the State of New Hampshire.

**CIVIL ACTION NO.**

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**JURY DEMAND Under Rule 38**

## INTRODUCTION

This is a complaint brought by Plaintiff, Wayne P. Saya, Sr., acting *pro se*, specifically

against the City of Nashua, hereinafter "Nashua" and the State of New Hampshire, hereinafter

1

"the State", for designing and implementing ordinances, regulations, and laws that mandate, require, harass and coerce me to wear an unregulated and non-safety-tested face-covering, defined as a medical device by the U.S. Food and Drug Administration "FDA".  It is my contention that the history and tradition for identifying scientific evidence of a contagion does not exist to directly or by proxy cause the city of Nashua and the State to require, mandate, or coerce me into face-covering protection.

Karen Umberger – Committee Chair of the fiscal committee of the New Hampshire General Court, along with Chuck Morse, Peter Leishman, Tracy Emerick, Lou D'Allesandro, and Cindy Rosenwald, are named as non-party Defendants in my complaint.

Bobbie Bagley, director of the Nashua Division of Public Health and Community Services (DPHCS), is also named as a non-party Defendant.

These actions by both Nashua and the State had and continue to cause significant health issues and are intentionally designed to hinder, abandon and prevent me from a number of my State policy protections and State and federal constitutional freedoms within their Bill of Rights, as I will be describing.

Members of the Fiscal Committee of the General Court: Karen Umberger–Committee Chair, Chuck Morse, Peter Leishman, Tracy Emerick, Lou D'Allesandro, and Cindy Rosenwald, are named as non-party Defendants.

My complaint is actionable under 42 U.S.C. section 1983 and pursuant to 18 U.S. Code §242 - Deprivation of rights under color of state law; my right to conduct commerce under the U.S. Commerce Clause within Article 1, Section 8, Clause 3 of the U.S. Constitution, and specifically the 'dormant commerce clause' against legislation that discriminates against or excessively burdens my ability to participate in interstate commerce, along with a number of

other United States Federal Codes. Also infringed-upon has been my Right to Privacy of Medical Information that is protected under New Hampshire regulatory policies.

I am also alleging; the Defendants within Nashua, are in violation of state law RSA §141-C:1-a, *Medical Freedom in Immunizations*, where through a city ordinance, these Defendants have devised a number of policy schemes that, individually or when combined, are designed to harass me into submission in wearing face-coverings and to receive an alleged vaccine injection, in violation of NH State law RSA 644:4 (Harassment). These city and state behaviors were and continue to be unwanted, bothersome and anxiety-provoking. However, taken with or without these harassment tactics, defendant Donchess, defendant Wilshire, and defendant Consentino, hereinafter the "Nashua Defendants", have and continue to use these tactics, using Nashua ordinance legislation as an instrument and means to coerce me into receiving an alleged vaccine, in order for me to avoid wearing an unregulated and non-safety-tested face-covering, as a condition for me to conduct business and commerce.

Finally, the history and tradition in the doctrine of states' rights holds that the federal government is barred from interfering with certain rights "reserved" to the individual states by the 10th Amendment to the U.S. Constitution. Accordingly, when the federal government, a third-party and not a defendant in this case, delivered a number of COVID-19 grants in the form of contracts to the State that were and are directed at my health and safety rights during Covid-19 - on their face these contracts went beyond interfering with the police powers of the State, and defendant Sununu, defendant Shibinette, and defendant Chan, knew or should have known that these contracts require a takeover of New Hampshire's police powers that are directed at my health and safety. In other words, these contracts amended the 9th and 10th Amendments to the U.S. Bill of Rights "by contract", including Articles 1 and 7 of the New Hampshire Bill of

Rights. Specifically, my argument and contention are directed against the unregulated and non-safety-tested face-covering policies and schemes that have no foreseeable remedies or conclusion, and continue to cause me a number of physical and psychological harms, including but not limited to mild to severe tachycardia and other cardiac events, mild to severe headaches and weakness.

Defendant Chan is also sued in his official capacity under color of state law for medical malpractice pursuant to NH law RSA 507-E:1, where Defendant Chan was and continues to act a paid agent of the federal government, and using the State's police powers on behalf of the federal government and not on my behalf, while being paid using monies received from the federal government.

Specifically, through the Defendants, New Hampshire has entered into contractual agreements with a government agency, the Centers for Disease Control and Prevention, hereinafter the "CDC", in order to receive millions of dollars in COVID-19 grant funding, where this CDC funding is contingent upon, among other effects, the State's relinquishing their 10th amendment police powers of all COVID-19 health and safety issues. Incorporated in this agreement include the practices and requirements for face-coverings.

The safety and regulatory policies for face-coverings are developed and promulgated exclusively by the FDA, not the CDC, and the FDA has not found public face-covering to be required during COVID-19. There are no FDA regulatory requirements or policies for the general public that currently require or mandate face-coverings. The above-mentioned CDC/State contract agreement is an attempt by both the CDC and the State to usurp the regulatory oversight of the FDA, in order for the State to be paid (through a grant) and the CDC

4

to assume and possess the powers of the State to control my State health and safety rights through all COVID-19 decisions.

I am seeking declaratory and injunctive relief from this court and a jury of my peers; that will, among other remedies, compel the city of Nashua and the State to withdraw and cancel their contractual obligations with the CDC, where the CDC possesses no regulatory enforcement powers for face-coverings, and that in part, illegally has and continues to require me to follow unregulated and non-safety-tested medical device (face-covering) policies in violation of FDA policy 21 U.S. Code § 331, chapter III - Prohibited acts, of the Food, Drug, and Cosmetics Act.

My relief is based upon the freedoms I was born with, and the laws and policies of the State, stemming from State common law policies and the state and federal Bill of Rights, and medical decisions I had enjoyed before the COVID-19 controversy. Notwithstanding a *bona fide* showing of scientific evidence to the contrary, this controversy stems from the City of Nashua and the State's illegal manipulation of my freedom of choice to wear or not to wear a face-covering.

## STATEMENT OF FACTS

### THE CDC IS NOT THE DESIGNATED FEDERAL REGULATORY AGENCY FOR ESTABLISHING STATE LEGISLATIVE OR EXECUTIVE POLICY FOR A MEDICAL FACE-COVERING DEVICE.

1.      All Defendants named in this controversy have, in most instances, solely relied upon non-binding recommendations from a component of the U.S. Department of Health and Human Services, hereinafter "DHHS", named the CDC, underlined exclusively for their decision-making, relating to the mandating, requirements, and recommendations for wearing face-coverings.

2.      The Defendant, either negligently or in an attempt to wrongly manipulate, reference the CDC as their reasoning for face-covering requirements, where I allege the CDC is not the

appropriate regulatory agency of the DHHS of the federal government that controls public safety

policy and rules for regulating the safe use of face-coverings for me and for the general public;

3.       Under Title 21 CFR Chapter 1, sub-chapter H (Medical Devices), the U.S. Food and

Drug Administration, hereinafter the "FDA", is the regulatory body that approves safety-testing,

regulates and administers federal public policy for all medical devices,

4.       and that the FDA has defined masks and face-coverings as a medical device,

5.       and by requiring me through policies and mandates to experience extended periods of

face-mask wearing, I suffered and in certain situations continue to suffer mild to severe

tachycardia and other cardiac events, mild to severe headaches and weakness, and varying

degrees of insomnia as a result of the physical and psychological issues in dealing with a long

recovery from an earlier cardiac procedure, performed at the Massachusetts General Hospital.

6.       In September of 2021, the FDA issued a revised "non-binding" guidance document[1] that

purports to continue their policy to help expand the availability of face masks, barrier face

coverings, and face shields <u>for the general public</u>, including healthcare personnel (HCP), while

simultaneously advising they do not maintain a list of face mask, barrier face covering, surgical

mask, or respirator suppliers.

7.       On page 1 of the above Guidance Document, it is stated:

> *This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is <u>not binding on FDA or the public</u>. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.* Emphasis supplied

8.       To satisfy an alternate approach, the CDC must incorporate safety-testing in accordance

with FDA standards of any alternate device, which I submit the CDC has not the authority.

---

[1] EXHIBIT 1A: Enforcement Policy for Face Masks, Barrier Face Coverings, Face Shields, Surgical Masks, and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency (Revised)

9.     However, Title 21 above only incorporates §880.6260(b)(1) - Filtering facepiece

respirator, (an N95 type face-mask) for <u>use by the general public</u> in public health medical

emergencies. Emphasis supplied

10.    The FDA refers to 42 CFR Part 84 of the National Institute for Occupational Safety and

Health "NIOSH" for certification (not regulation) of the N95 mask.

11.    §880.6260(a) of Title 21 *above* defines this type of face-covering as follows:

> *A filtering facepiece respirator for use by the general public in public health
> medical emergencies is a device that is a disposable half-facepiece non-powered
> air-purifying particulate respirator intended for use to cover the nose and mouth
> of the wearer to help reduce wearer exposure to pathogenic biological airborne
> particulates during a public health medical emergency.*[2]

12.    By definition, the federal government through the FDA, for safety purposes does not

include cloth-fabric face coverings, but only those *made of polymeric materials, . . intended to fit*

*closely to the face and to function by filtering particulate material.* — §880.6260(a) *above.*

13.    The absence of additional face-coverings, other than N95 polymeric material devices,

reveal there are no additionally "approved"[3] face-coverings offered to the general public by the

FDA, where, as a medical device, the FDA regulates *Premarket Approval of Medical Devices,*

using an efficient and thorough device review process revealed in sub-part §814 of Title 21

*above.*

14.    Contrary, the CDC does not have the regulatory authority to offer (through federal code

or CFR) a review process for medical devices, such as face-coverings.

15.    Because §880.6260(b)(1) of Title 21 of the FDA is listed as "non-binding" "on the

public" *(see above)* within the FDA's September 2021 Guidance document, there is no federal

---

[2] EXHIBIT 1B: 10. §880.6260(a) of Title 21 as shown in the federal register.
[3] EXHIBITS 2A & 2B: The approval process is governed by Title 42 CFR Chapter 1, sub-chapter G, Subpart B -
Application for Approval, § 84.10 Application procedures, and § 84.10 Certificates of approval; scope of approval.

government regulation, policy or rule, that mandates or requires me to wear any face-covering during the current COVID-19.

Accordingly, Nashua and the State are therefore requiring me to wear a face-covering based upon citing an agency (CDC) that has no federal jurisdiction or qualification in the review process for face-coverings, and in violation of the Food Drug, and Cosmetics Act, 21 U.S. Code § 331, chapter III - Prohibited acts, of the FD & C.

16.     I am seeking the return of my right to decide, whether I wear a face-covering or whether I elect not to wear a face-covering, based upon federal policy, science and sound engineering principals, as shown *above* and within the following complaint.

<u>THE NASHUA CONTROVERSY</u>

17.     I am alleging; that the Nashua Defendants, amended ordinance number O-21-065,[4] where this amendment purports to rescind a city-wide Face-Covering mandate, but in reality, directs businesses to <u>maintain</u> face-covering procedures, specifically citing the CDC, a federal agency that does not regulate or safety-test face-coverings or face-masks.

The Nashua Defendants use alternate non-binding CDC guidance documents, references, and confusing and unclear written policy requirements, as an illegal scheme to require me to wear a face-covering, pursuant to, among other violations, the Food, Drug and Cosmetics Act, 21 U.S. Code § 331, chapter III - Prohibited acts, of the FD & C.

18.     The Nashua face-covering ordinance also requires Nashua businesses to act as enforcement agents for the city of Nashua, where the language within the Nashua ordinance is duplicated on signage that is affixed to the windows and entry-doors of businesses and store-fronts throughout shopping malls and independent store locations.

---

[4] EXHIBIT 28 (late entry): Nashua Ordinance No. O-21-065.

19.     Because the Nashua ordinance relies, in part, upon the wrong federal agency for face-covering safety regulation, I submit that Nashua's ordinance, as written, is causing these Nashua businesses to be in violation of New Hampshire law, Chapter 358-A:2, Regulation of Business Practices for Consumer Protection,

20.     These face-covering procedures, designed for and against Nashua businesses, directly affects me, where I am urged, directed or required to wear a face-covering if I have not been inoculated with a COVID-19 vaccine, putting me in a situation that is consciencely uncomfortable, apprehensive due to health concerns, and with mixed-emotions in whether to enter these businesses that participate in the city-wide mask-covering law that is, at the very least threatening to me—because I am not familiar with or comfortable in devising ways of circumventing around obstacles in order to gain basic freedoms of movement.

21.     When walking through the various shopping malls and department stores, I avoid those businesses that request face-coverings without vaccinations, because I don't know when I will be publicly called upon to prove or explain my vaccination status, confusingly in a State that (by law) does not require me to be vaccinated.

22.     **First,** This stated amended ordinance *". . urges that essential businesses, <u>at a minimum</u>, establish hours, processes or environments where <u>masks must be worn</u> for the comfort and safety of vulnerable persons.*

23.     This urging has resulted in face-covering requirements throughout Nashua to require a face covering if not vaccinated, circumventing State law, RSA §141-C:1-a, Medical Freedom in Immunizations,[5] where essential businesses within Nashua are directed to comply with the state's "essential businesses" criteria.[6] These criteria incorporate virtually "all" public and

---

[5] EXHIBIT 3:  New Hampshire law, §141-C:1-a Medical Freedom in Immunizations.
[6] See Ordinance section 4, sentence 2: *The Board of Health strongly urges that <u>essential businesses</u>, . . "*

private business transactions, as promulgated under the State's definition of "essential businesses".

24.    Emergency Order #17, Exhibit A,[7] describes "essential businesses" to include, but are not limited to:

- **My grocery and consumer-health supplies, liquor purchases and other (clothing) retail:** Workers supporting groceries, pharmacies, florists, and other retail, including farmers markets and farm stands, that sells food and beverage products, including liquor stores;

- Eating-out at restaurants: Restaurant carry-out and quick serve food operations, including beer and wine curbside and takeout - Carry-out and delivery food employees

- Obtaining my family prescriptions and over-the-counter health remedies: Pharmacy employees necessary for filling prescriptions

- My computer and my home-security repairs at Best Buy® and their Geek Squad® repair Services: repairs IT and OT technology staff – for EMS (Energy Management Systems).

- My Comcast Cable TV, Internet provider, and Verizon phones: Control and Data Acquisition (SCADA) systems, and utility data centers; Cybersecurity engineers;

25.    **Secondly,** the amended ordinance is also confusing, ambiguous and misleading, where it mixes arbitrary Nashua Board of Health recommendations with capricious language provided by the Nashua Board of Alderman that violates the earlier-described FD&C Act:

Paragraph 1. *". . . members of the public who are fully vaccinated are no longer required to wear a face covering over their mouth and nose outdoors or indoors where business is*

---

[7] EXHIBIT 4: Emergency Order #17, Exhibit A

*conducted <u>unless required by that business</u>, organization or worksite in Nashua.*
Emphasis supplied

26. While further-on in the ordinance: <u>Paragraph 5</u>.

> *The Board of Health recommends that businesses <u>weigh the risks</u> of protecting the patrons and their staff. <u>If a business requires mask wearing, this would mean both vaccinated and unvaccinated people must comply as at present</u>, they would not have any universally accepted way to distinguish between the two.* Emphasis supplied

27. This leaves businesses no choice but to require face-coverings, and in-turn for me to wear any type of face-covering, regardless of effectiveness, unless I am vaccinated with the COVID-19 vaccine. It is this alone that I submit, is in violation of RSA §141-C:1-a —*see above*

28. **Third,** Nashua has created an emotionally harmful and publicly divisive public-relations *"Be Part of the Solution"* scheme, that promoted the COVID-19 vaccines alongside this city ordinance, where these actions created an expedited enactment of business enforcement by-way-of signage. In-turn, this named public relations scheme, hindered and maligned me and my ability, through self-conscience, to enter public, private and retail buildings, certain public and private businesses, stores and restaurants, unless I become a *". . part of the solution"* to wear a medical face mask and/or become vaccinated for the pathogen described as CoVID-19.

29. This *"Be Part of the Solution"* campaign scheme purportedly incorporates the following:

> 1. *Prevent infectious individuals from spreading their <u>respiratory droplets</u>.*

> 2. *Act as a barrier by preventing <u>respiratory droplets</u> from entering into the wearer's nose and mouth.* Emphasis supplied

30. However, all Defendants knew or should have known, that as a recognized and controlling FDA consensus standard, as of March 1, 2021, (85 days before the Nashua

> revised ordinance was promulgated), under 42 CFR Part 84 - *Approval of Respiratory Protective Devices, and Enforcement Policy for Face Masks, Barrier Face Coverings, Face Shields, Surgical Masks, and Respirators—*the FDA's . . *use of the word <u>"droplets"</u> in Subsections 1.1, 1.2.2, and 3.1.12 is not consistent with the rest of this standard itself*

*in that there are no corresponding Sections in the standard (42 CFR Part 84) defining an appropriate test method . . "* Emphasis supplied

31.      Accordingly, the FDA, the federal agency that is charged with the regulatory oversight of face-coverings, recognizes that there are no appropriate test methods to determine the infectious nature of droplets. In fact, the FDA does not require any face-coverings on me or the public. I submit that these emotionally hurtful and publicly divisive actions [8] remind me of when I learned of the uncomfortable prelude toward the anti-Japanese and anti-Jewish sentiments of World-War II,[9] that created a number of prejudices, as bold signs with opinionated and intolerant slogans were erected on storefronts, some not dissimilar to the signage now observed at the storefronts within New Hampshire shopping malls and downtown Nashua store fronts[10] that strongly request or require me to be vaccinated before entering.

32.      **Fourth,** the Defendants, aware that no emergency has been declared by defendant Donchess or defendant Sununu, respectively, are continuing face-covering protocols without receiving science-based evidence that reveals the existence of the hazard or danger that has created the emergency. *See* Count V—*below.* Defendants Donchess and Sununu are aware, to require face-coverings requires FDA safety-testing of the face-covering devices, along with science-based identification of the contagion.

33.      **Fifth,** through the Nashua ordinance, the Defendants urge, direct, and require the use of a face-covering if not inoculated with the COVID-19 vaccine, is designating those of us without a vaccine as having a medical condition (masks are medical devices under FDA) thereby having a disability, while simultaneously the US Attorney General has stipulated that COVID-19 does not constitute a disability—*(see U.S. AG letter* **exhibit 8***)*

---

[8]  See Plaintiff's Affidavit and this complaint
[9]  EXHIBIT 5: Photos
[10]  EXHIBIT 6:  A sampling of store-front signs from Nashua, NH, businesses.

34.     **Sixth,** because of the confusion the Nashua ordinance exhibits, businesses in Nashua incorporate a variety of signs, from requiring masks if not vaccinated, to requiring full mask wearing, to having no mask signage at all.

35.     However, at times when I elect to chance through necessity to enter a pharmacy or clothing store, a number of these Nashua stores and businesses have engaged me when I am not wearing a mask.[11] These stores and businesses have been individually inconsistent in their enforcement because of the ambiguities and confusing language within the Nashua ordinance.

36.     I submit this is because the described ordinance is not only confusing, ambiguous and misleading, but also does not incorporate a city enforcement provision.

37.     I submit that these ambiguities, while providing no enforcement provision, makes this Nashua ordinance unenforceable.

38.     Because of the inability of the Nashua Defendants to enforce their own ordinance, there legislative action is unconstitutional. See Texas, et al v, California, et al, No. 19-840, Decided June 17, 2021.

39.     **Finally,** when combining the above paragraphs 21 through 37, which I will call "sub-claims", Nashua is in conflict with RSA §141-C:1-a, shown above.

40.     Where New Hampshire is not a "home rule" state, cities and towns like Nashua, possess only the powers the New Hampshire legislature has expressly given them. Since preemption results from the very nature of municipal existence, and without limiting the individual effectiveness of each above-numbered sub-claim, I submit the combination of these sub-claims preempts Nashua ordinance O-21-065, making the entire ordinance as unenforceable.

<u>THE UNKNOWN CONTAGION NAMED COVID-19</u>

---

[11] Elaborated in Plaintiff's Affidavit

41.    On January 20, 2020, the NEJM published an original research article, entitled: *A Novel Coronavirus from Patients with Pneumonia in China, 2019*. The article would describe the following:[12]

- that SARS-Cov-2, later named COVID-19, was given its name in 2019 in Wuhan, China, by a team of microbiologist' using *testing criteria* which they acknowledged was not recognized within the global scientific community;

- where the scientifically recognized *testing criteria* required for this microbiological study, is recognized within the NEJM article and around the globe, as the "Koch Postulates"—a set of criteria that establishes whether a particular organism is the cause of a particular disease.

- that a *testing protocol*, recognized as a Polymerase Chain Reaction, or PCR, was also performed using a level of sensitivity far outside of the scientifically accepted amplification range (or count threshold), that would ordinarily void similar types of scientific testing,

- and that the NEJM study revealed, that further development of accurate and rapid methods to identify unknown respiratory pathogens would still be needed after the publication of the-above study. In other words, the biological information that was sought-after, was not scientifically identified as any new or 'novel'.

42.    The NEJM identified; that the pathogen coined SARS-CoV-2, and later named COVID-19, originated in this Wuhan, China, lab, and that the pathogen was at no time identified (using accepted science practices) as a "novel" or new virus, because the scientifically accepted *testing criteria*, the 'Koch's Postulates', was not used, as openly and deliberately admitted by these microbiologists within this NEJM research article.

43.    This non-scientific testing acknowledgement within the NEJM was based upon a count threshold *testing criteria* that was set at an excessive amplified value, and because of this high level of amplification, the Wuhan lab was able to generate an unknown coronavirus fragment,

---

[12] EXHIBIT 7: New England Journal of Medicine (NEJM) A Novel Coronavirus from Patients with Pneumonia in China, N Engl J Med 2019

44.     but this fragment could have come from or belong to any number of coronaviruses or other previously-known biologics.

45.     This NEJM research study also revealed; that the amplified PCR testing did identify this fragment as an apparent *member of the family of coronaviruses that infect humans.*

46.     However, although there are a large number of coronaviruses, including the common cold, the microbiologists conducting this unorthodox-type study, identified this unknown pathogen as "novel", while simultaneously acknowledging that the required scientific testing used to identify "novel" pathogens was not used.

47.     When similar symptoms started appearing in the United States, the U.S. government used the same unscientific *testing criteria* that was described in the (above) 2020 NEJM study, and once the same results were witnessed within the U.S., the U.S. NIH and the U.S. CDC announced that COVID-19 had reached the United States.

48.     It was at this time that many in the scientific community within the U.S. and around the globe became at odds with each other, creating a global scientific controversy, mainly because the amplified PCR testing protocol used in China during the scientifically unrecognized testing procedure was duplicated throughout the globe against the established scientific *Koch's postulates* protocol.

49.     This global science controversy, in part, was described within news accounts, as taking a very tiny amount of DNA and growing it exponentially until it could be analyzed, but any minute' contaminations in the sample will also be amplified leading to potentially gross errors of discovery.

50.     Additionally, and as reported, the China microbiologist testing <u>was only looking for partial viral sequences</u>, not whole genomes, which is an extremely important distinction, so

identifying a single pathogen is next to impossible, even if you ignore the other many science issues not described here.

51.     Therefore, if the Wuhan lab found only a "partial viral sequence", and that partial sequence was located, (no indication it was), then it could be a "novel" partial sequence of any number of coronaviruses.

52.     This controversy exists because, the opinions of professional witnesses I intend to call upon during trial, face-masks or face-coverings are not required for a number of air-quality and personal health reasons, but specifically because, the PCR testing procedure used to identify COVID-19, is not using an actual (specimen) sample of a naturally occurring "novel" fragment or pathogen.[13] Rather, according to the CDC, they are using synthetically created assays of a number of pre-selected and previously-identified biological fragments and pathogens, a man-made soup mixture, spiked into a dilutant consisting of a suspension of human A549 (lung cancer) cells and viral transport medium (VTM) to "mimic", what the NIH and CDC asserts, is a COVID-19 clinical specimen. Accordingly, it is this soup mixture that the CDC declares as a "novel" SARS-Cov-2 or COVID-19 contagion.[14]

53.     The Defendants are using and relying upon a computer-generated synthetically created specimen named COVID-19, in place of an identified naturally-occurring fragment pathogen that was scientifically isolated in a lab, where, upon information and belief, the created specimen is not based upon any previously recognized and *bona fide* science.

---

[13] See Affidavit EXHIBIT 28: An Nobel Prize winner explanation of the COVID-19 global controversy in the scientific community.

[14] EXHIBIT 9:  The 72-page CDC Instruction Manual for U.S. medical facilities conducting PCR testing on the public at-large for SARS-Cov-2 or COVID-19. *See page 40, par 2, ". . . Since no quantified virus isolates of the 2019-nCoV were available for CDC use at the time the test was developed and this study conducted, assays designed for detection of the 2019-nCoV RNA were tested with characterized stocks of in vitro transcribed full-length RNA (N gene; GenBank accession: MN908947.2) of known titer (RNA copies/µL) spiked into a diluent consisting of a suspension of human A549 cells and viral transport medium (VTM) to mimic clinical specimen.*

54.     However, even if a COVID-19 virus had been successfully identified using established science, the initial and current PCR testing is based upon statistics that are flawed at a minimum of the following explanations:

a.      Every statistic regarding COVID-19 is based upon the PCR test, which is a limited test that cannot, on its own, determine whether a test subject is infected with COVID-19 absent a physical examination by a medical doctor along with other testing (white blood counts, etc.);

b.      the PCR test is highly sensitive, with the result of the test being dependent upon an extremely high and defective cycle threshold, or at the very least, unreliable cycle threshold ("CT") at which the test is conducted;

c.      Dr. Anthony Fauci, director of the U.S. National Institute of Allergy and Infectious Diseases, hereinafter "NIAID", has acknowledged that a test conducted at a CT of over 35 is useless;

d.      studies have confirmed Dr. Fauci's conclusion, showing that tests conducted using CT values over 35 have yielded up to eighty percent (80%) false positives;

e.      yet, the CDC's PCR operational manual require all hospitals and medical facilities testing for COVID-19 to be set at no less than a CT count of 40?[15]

f.      Despite this known CT sensitivity, the PCR tests and their CDC manuals requiring a CT count of 40, were mass-distributed throughout New Hampshire in 2020 without training, and were used by New Hampshire hospitals and medicals facility technicians who were not made aware by defendant Sununu, defendant Shibinette, defendant Chan, and defendant Consentino, of the underlying flaw in the test, and were and continue to be operated wrongly and recklessly at a CT value in excess of 35 at the direction of the CDC,

---

[15] *See* EXHIBIT 9:  pages 34 and 35.

g.       and these flawed tests conducted throughout New Hampshire created and continue to

create unknown thousands of positive COVID-19 test results, which in-turn add to the State's

COVID-19 infection numbers each day.

55.      The Defendants cannot explain the science that is used—while simultaneously continuing

to use it, in-turn referring me to the US-DHHS and CDC websites, keeping with defendant

Sununu's unlawful COVID-19 contract grants with the federal government—later explained.

56.      This wholly unreliable testing, by design requires me to wear a (medical device) face-

covering without providing a valid scientific or reasonable medical health purpose when alone

considering the defective testing protocols.

57.      These valid engineering and scientific protocols also include the material ineffectiveness

and known physics which support against wearing such face-covering.

58.      Because this described coronavirus pathogen could be from an earlier isolated SARS or

SARS-coronavirus *(later explained)*, or the earlier H1N1 virus, or any other previous viral illness

that I have developed immunities in past years, I do not believe that I require protection from an

unknown coronavirus pathogen.

59.      I also am opposed to wearing a face-covering, because I believe that my personal

immunities from viral infections provide for a higher degree of defense than the questionable and

ineffective protections provided from wearing an unregulated and non-safety-tested government-

required face-covering, along with what will be shown as defective government peer reviewed

PPE.

## ALL DEFENDANTS ARE INVOLVED IN A SCHEME TO AMEND THE NEW HAMPSHIRE AND FEDERAL BILL OF RIGHTS BY CONTRACT

60.     I recognized that the Defendants have not made any attempts to validate or investigate the

facts as I have just explained, and all Defendants continue to ignored or refused to answer my

requests and pleas from other members of the New Hampshire citizenry, to corroborate these

facts, or validate their reasoning for requiring me to wear a face-covering.

61.     It is my belief; that my requests for information have been intentionally ignored, because

upon news reports, information and belief, defendant Sununu, on behalf of all Defendants, had

entered into a number of Contract Grants with the United States Government, which relinquish

and surrender my State and Federal rights over to the federal government, including, but not

limited to the following:

> 1) to comply with existing and/or future directives and guidance from the U.S. Secretary
>
> of Health and Human Services, "US-DHHS" regarding control and complete oversight of
>
> the spread of COVID-19;
>
> 2) arrange and coordinate with the US-DHHS, to provide, commensurate with my
>
> condition or the condition of NH citizenry, all COVID-19 patient care regardless of the
>
> individual's home jurisdiction and/or appropriate public health measures (e.g., social
>
> distancing and home isolation), including face-covering practices, requirements and
>
> mandates, and
>
> 3) the State of New Hampshire is to assist the United States Government in the
>
> implementation and enforcement of federal orders related to quarantine and isolation
>
> regarding COVID-19.

62.     The New Hampshire and U.S. Bill of Rights, the 9th and 10th Amendments to the Bill of

Rights and the U.S. Constitution, and Article 1 (Equality of Men; Origin and Object of

Government) and Article 7 (State Sovereignty) of the New Hampshire Bill of Rights, under color

of State law, reaffirm that the federal government has limited and enumerated powers,

63.     and that these enumerated powers, among others, that apply to me in this case are found

in Article 1, section 8, of the U.S. Constitution, and specifically under the commerce clause of

paragraph 1 and the necessary & proper clause of paragraph 18.

64.     The national government has certain powers, but that these powers are limited by the

powers of my State and my individual rights as a citizen within New Hampshire.

65.     The 14th Amendment to the U.S. Constitution incorporates the Bill of Rights into the

States.

66.     As a result of the earlier-described Defendant Sununu COVID-19 contract grants, upon

information and belief, defendant Sununu knowingly and intentionally relinquished, abandoned

and surrendered all of my 9th and 10th Amendment federal rights afforded to me by the State of

New Hampshire, to the federal government, specifically regarding COVID-19 health and safety.

67.     I do not believe the State of New Hampshire should be signing a contract, through the

promise of money, to hand-over my rights in the police powers over to the executive branch of

government, but rather the same federal government, as provided through the above Bill of

Rights and constitutional amendments, should be only assisting the State of New Hampshire in

support of my 9th and 10th amendment guarantees to the State.

68.     Quoting from Bond v. United States, (No. 09-1227) 581 F. 3d 128, reversed and

remanded.

> *". . . where the litigant is a party to an otherwise justiciable case or controversy,[Plaintiff] is not forbidden to object that [his] injury results from disregard of the federal structure of our Government. Whether the Tenth Amendment is regarded as simply a " 'truism,' "* New York, supra , at 156 (quoting United States v. Darby , 312 U. S. 100, 124 (1941) ), *or whether it has independent force of its own, the result here is the same.*

69.     I submit that defendant Sununu has "amended" the above-mentioned NH State Bill of Rights and the 9th and 10th Amendments to the national Bill of Rights by way of an illegal COVID-contract.

70.     and that it is because of this illegal COVID-contract that the Defendants are unable to remove the unnecessary and ineffective face-covering rules, directives, policies, and mandates within the State of New Hampshire.

## THE PARTIES

*Plaintiff;*

71.     *Wayne P. Saya, Sr*. - I am a sixty-six-year-old retired executive, residing at 24 Cadogan Way, Nashua, New Hampshire. I have been a resident in New Hampshire for the past thirty-plus years.

72.     My wife Nancy has dual citizenship with the Country of Columbia, South America and the United States and I was born in Winchester, Massachusetts. The two of us raised two children from birth within the Nashua school system. Our daughter was born in Boston, Massachusetts, and graduated Nashua, North, with honors, and now holds two medical degrees in healthcare from Michigan and Ohio. Our son, born at Southern New Hampshire Medical Center, graduated Nashua North, with honors, and was the first 'male' student recruited from Nashua, North, to the U.S. Naval Academy in Annapolis, Maryland, graduating the Academy in 2017.

73.     During both of my children's attendance in the Nashua school system, I donated thousands of dollars to Nashua, North High School, for their science department in the form of microscopes for microbiology studies along with other science learning equipment secured from

Tufts University, Boston, Massachusetts. Nancy and I have always tried to be an integral and supportive part of the Nashua, New Hampshire community.

74.     In my retirement, I work part-time as WP Saya & Associates, LLC,[16] and currently the executive vice-president (part-time) of SUSTAP, a Pennsylvania-based company specializing in sustainable technologies, products and proprietary facilities training and certification in Facilities Profiling®.[17]

75.     My Curriculum Vitae is attached as Exhibit 10.

*Defendants*

76.     **JAMES W. DONCHESS**, hereinafter "Defendant Donchess", is being sued individually and in his official capacity as Mayor of Nashua, New Hampshire, his agents, successors and employees, for gross negligence with reckless disregard and abandonment, including harassment as alleged in this complaint. Defendant Donchess has a business address at 229 Main Street, Nashua, NH 03061.

77.     In accordance with §4 of the Nashua city charter, Defendant Donchess is the principal officer of Nashua, and administers the fiscal, prudential, municipal and other government affairs.

78.     The facts and injuries alleged by me in this complaint will be shown as directly traceable to Defendant Donchess's endorsements and enforcement practices of the above-mentioned Nashua ordinances.

79.     **LORI WILSHIRE**, hereinafter "defendant Wilshire", is being sued individually and in her official capacity as President and presiding officer of the Nashua, NH Board of Alderman,[18] her agents, successors and employees, for gross negligence with reckless disregard and

---

[16] EXHIBIT 10: Wayne P. Saya, Sr., Curriculum Vitae
[17] http://www.sustap.com/
[18] The Board of Aldermen, collectively, is the governing body of the City of Nashua, hereinafter 'city of Nashua" and as such is the policy-making entity of the City, except where otherwise expressed in the City Charter.

abandonment, including harassment as alleged in this complaint, while representing the

collective governing body of the Nashua Board of Alderman, where I allege Defendant Wilshire

knew or should have known that her leadership conduct in the endorsement and approval of

ordinance numbers O-20-018, O-20-029, and O-21-065, incorporated and instituted

unenforceable instruments that she knew or should have known would cause a controversy that

did and continues to cause me physical and emotional harm as a citizen of Nashua, New

Hampshire.

80.     The facts and injuries alleged by me in this complaint will be shown as directly traceable

to Defendant Wilshire's endorsements, participation and oversight of the above-mentioned

Nashua ordinances.

81.     Defendant Wilshire has a business address at 229 Main Street, Nashua, NH 03061.

82.     **ANGELA CONSENTINO**, a/k/a Angela Consentino-Lumenello, a/k/a Angela Maria

Consentino, hereinafter "defendant Consentino, is an independent contractor, incorporated in the

State of Massachusetts as owner/operator of EPIPATH CONSULTING LLC, Mass business ID

no. 001532048, and with a business address listed as 6 Hayden Circle, Billerica, Massachusetts

01862.

83.     Defendant Consentino is being sued individually and in her official capacity as third-

party contractor epidemiologist for the City of Nashua, New Hampshire, for gross negligence

with reckless disregard and abandonment, including harassment as alleged in this complaint.

84.     The facts and injuries alleged by me in this complaint will be shown as directly traceable

to Defendant Consentino's endorsements, practices and official recommendations to the Nashua

Defendants.

85.     Venue for defendant Consentino is under 28 U.S. Code § 1391 - Venue generally.

86.    **HONORABLE CHRIS SUNUNU**, hereinafter "defendant Sununu", is being sued individually and in his official capacity as Governor of the State of New Hampshire, his agents, successors and employees, for gross negligence with reckless disregard and abandonment, including harassment as alleged in this complaint.

87.    Defendant Sununu has a business address of: Office of the Governor State House 107 North Main Street Concord, NH 03301.

88.    The facts and injuries alleged by me in this complaint will be shown as directly traceable to Defendant Sununu's executive orders, U.S. government and State contract endorsements, subordinate participations, and enforcement practices within the above-mentioned controversy.

89.    **LORI SHIBINETTE**, hereinafter "defendant Shibinette", is being sued individually and in her official capacity as commissioner for the New Hampshire Department of Health & Human Services, her agents, successors and employees, for gross negligence with reckless disregard and abandonment, including harassment as alleged in this complaint.

90.    Defendant Shibinette has a business address of: New Hampshire Department of Health and Human Services, DHHS, 129 Pleasant Street, Concord, NH, 03301-3852

91.    The facts and injuries alleged by me in this complaint will be shown as directly traceable to Defendant Shibinette's U.S. government and State contract grant authorizations, unlawful State public health directives, subordinate participations, and NH Department of Health and Human Services unlawful policies and enforcement practices within the above-mentioned controversy.

92. **BENJAMIN P. CHAN, MD, MPH**, individually and in his official capacity as State

Epidemiologist for State of New Hampshire. Defendant Chan is being sued individually and in his official capacity for medical malpractice under NH law;[19] RSA Chapter 507-E – Medical Injury Actions, along with separate allegations of gross negligence with reckless disregard and abandonment, including harassment as alleged in this complaint.

93.     Defendant Chan has a business address at: The Bureau of Infectious Disease Control, Division of Public Health Services, NH Department of Health & Human Services, 29 Hazen Drive, Concord, NH 03301

94.     The facts and injuries alleged by me in this complaint will be shown as directly traceable to Defendant Chan's medical malpractice, where Defendant Chan intentionally failed to properly diagnose and medically prognose safe and effective remedies and alternatives for face-covering while I was recovering from a cardiac medical procedure, and where Defendant Chan continues to use false and misleading federal jurisdiction(s) and non-science-related information that is untrue and misleading to justify his requiring me as a citizen of New Hampshire to wear a face-covering.

## JURISDICTION and VENUE

95.     This court has subject-matter jurisdiction under 42 U.S.C. §1983, as they all include violations of constitutional law, and pursuant to 18 U.S. Code §242 - Deprivation of rights under color of law for deprivation of my rights, privileges, and immunities secured and protected by the due-process clause and section 1 of the fourteenth Amendment to the United States Constitution and the Bill of Rights, and where the Defendants have and continue to cause me harm.

96.     Under 28 U.S.C. 1367 this Court maintains supplemental jurisdiction over state

---

[19] NH Office of Professional Licensure and Certification: Benjamin P. Chan, MD, NH Medical License No: 14789, Type: Physician - Issue Date: 4/7/2010 Expiration Date: 6/30/2022.

constitutional claims as codified under the New Hampshire Bill of Rights, Part 1, under articles 7 and 8, where the Defendants have and continue to cause me harm.

97.     This Court exercises subject matter jurisdiction under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts to hear suits secured by the United States Constitution while acting under color of state law.

98.     This Court has the authority to the requested declaratory relief under 28 U.S.C. § 2201, and the requested injunctive relief under 28 U.S.C. §1343(a).

99.     Venue is appropriate because all Defendants work within the district boundaries for this Court, and because all of the remaining Defendants, whose identities will be determined via discovery, are employed by the city of Nashua, New Hampshire and the State of New Hampshire, there is therefore a high probability that all remaining Defendants live in or near this Court's district.

100.    I am alleging; that the Defendants recklessly disregarded and abandoned their elected, appointed and constitutionally recognized city and state duties and responsibilities, against my sovereign interests under their 9th and 10th Amendment obligations to the State under Articles 7 and 8 of the New Hampshire Bill of Rights,  and under the 9th and 10th amendments to the United States Constitution and Bill of Rights, while under color of state law and common law, where the U.S. government has been allowed by the Defendants to use contract grants, to interfere with and take control of the Police Powers of the state and state sovereignty in violation of my rights under these bill of rights and constitutional protections.

101.    My common law sovereignty argument is based upon, among other things, the case of Bond v. United States (No. 09-1227), 581 F. 3d 128, reversed and remanded.

102.    U.S. Commerce Clause within Article 1, Section 8, Clause 3 of the U.S. Constitution, and

specifically, the 'dormant commerce clause' against legislation that discriminates against or excessively burdens my ability to participate in interstate commerce.

103.    RSA §141-C:1-a, Medical Freedom in Immunizations (Nashua Defendants)

104.    RSA Chapter 507-E – Medical Injury Actions (Defendant Chan)

**New Hampshire State Laws**

105.    New Hampshire statutes, RSA chapter 507-B, section 507-B:4, Effect on Common Law, where bad faith is alleged and an intentional tort along with other harms, and RSA Chapter 31, section 31:104, where bad faith is alleged and an intentional tort.

106.    New Hampshire statue, RSA chapter 99-D, section 99-D:1, Defense and Indemnification of State Officers and Employees;

107.    New Hampshire statute, RSA chapter 99-D, State Officers and Employees.

108.    New Hampshire statute, RSA Chapter 125, section 125:9, I, and II, Commissioner of DHHS, Department of Health and Human Services,

<u>**CAUSE OF ACTION**</u>

<u>**COUNT I**</u>

**Declaratory and Injunctive Relief**
Cessation of Amended Nashua Face-Covering Ordinance.
(Nashua Defendants)
18 U.S. Code §242 - Deprivation of rights under color of law.
Violation of State Law RSA 141-C:1 Medical Freedom in Immunizations Act,
Violation of 21 CFR §50.20 & §50.25- Informed consent
45 CFR Subpart A - Basic HHS Policy for Protection of Human Research Subjects.
Article 1, Section 8, Clause 3 of the U.S. Constitution, (Dormant Commerce Clause)
9th & 10th Amendments to the U.S. Bill of Rights and Constitution
14th Amendment to the U.S. Constitution

109.    I adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

110.    New Hampshire State Law, RSA 141-C:1—House bill 220, Enacted July 23, 2021, where

the new law says that the state cannot mandate vaccinations, nor can State Government set rules to participate in society based on an individual NH Citizens private medical status:

> *I. Every person has the natural, essential, and inherent right to bodily integrity, free from any threat or compulsion by government to accept an immunization.*
> Emphasis supplied

111.    Accordingly, there is no state of emergency currently declared by NH State government that would trigger the State's "emergency" Police Powers against RSA 141-C:1; the NH and U.S. Bill of Rights, and their Constitutions, respectively.

112.    On May 26th of 2021, Nashua rescinded its face-covering mandates, numbers O-20-018 and O-20-029. However, when I read the (Amended) ordinance, number O-21-065, I learned that the ordinance treated me differently—as a separate class of person as a result of not receiving a medical procedure identified as a vaccine.

113.    According to the American Medical Association "AMA", a medical procedure is known and defined as a course of action intended to achieve a result in the care of a person or patient, and a vaccination is recognized as a medical procedure.

114.    The CDC has now defined a vaccination as "protection" against the described COVID disease, and no longer as a means to "prevent" the disease, and no longer a means to create "immunity" from the disease.

115.    The CDC's evolving definitions of a vaccine as a medical procedure:

a.    Vaccination Pre-2015: *Injection of a killed or weakened infectious organism in order to **prevent** the **disease**.*

b.    Vaccination (2015-2021): *The act of introducing a vaccine into the body to **produce immunity** to a specific disease.*

c.    Vaccination (Sept 2021): *The act of introducing a vaccine into the body to **produce protection** from a specific disease.*

116.    There is also a conflict with the American Medical Association (AMA) and the U.S.

CDC regarding the definition of a vaccination, where the AMA defines a vaccination as:

> Vaccination- *a form of immunization in which killed or weakened microorganisms are placed into the body, where antibodies against them are developed; if the same types of microorganisms enter the body again; they will be destroyed by the antibodies.*

117.   The AMA definition of vaccination describes "a form of immunization" for preventing a disease, and the CDC now describes a vaccination as a means to "produce protection" only from a specific disease, and not a method to create immunity.

118.   Nonetheless, both vaccine-definitions describe 'medical procedures'.

119.   The ordinance was establishing a city-wide dilemma for me, because I have not been vaccinated, and unable to participate in business errands and commerce, because, among other ordinance sections, the ordinance provides the following warning:

> *2. The Board of Health and the Board of Aldermen highly recommend members of the public who are not fully vaccinated **should continue to wear a mask** for their own protection and that of others **until they are fully vaccinated** or until the appropriate health organization deems it **safe** to not wear a mask.*

120.   As an unvaccinated person, I was now deemed unsafe to be around to the public-at-large until the appropriate health organization deemed me safe.

121.   Additionally, I have been deemed unsafe from Nashua Defendants who are, in part, relying upon a federal agency (CDC) that does not regulate or safety-test the very face-covering that I am required to wear in order to be safe, unless or until fully vaccinated?

122.   On or around June 9, 2021, the Nashua Board of Health Meeting published a set of meeting minutes that clarified their position on the wearing of face-masks;[20] indicating:

> *Most fully vaccinated people are safe from Covid and do not need to wear masks except when required by state or Federal law or Local Policy . . . Pg.1*

---

[20] EXHIBIT 11 – June 9, 2021, Nashua Board of Health Meeting Minutes

*1. Those who are unvaccinated should wear a mask for their own protection and that of others until they get vaccinated or until the appropriate health organization deems it safe not to wear a mask.*

123.    Shortly thereafter, I recognized that the City of Nashua quickly developed a campaign

that was advising all, which I had taken personally and considered offensive, to *"Be Part of the*

*Solution"*[21] in Wearing a Face Mask if not fully vaccinated.

124.    This was a campaign that jump-started business-owners to quickly have their stores and

restaurants recognized using signage that duplicated their ordinance.

125.    Once these notices started appearing on the front doors and windows of businesses, my

non-vaccinated status was targeted, and in-turn causing complete strangers to question me in

whether I had been vaccinated because I was wearing a mask?

126.    One of these complete strangers pointed at me within the Nashua Home Depot and

bluntly told me to *be part of the solution, man, where's your mask?!* It was shortly after this

encounter I went onto the Nashua city hall website to examine the current face-covering rules,

when the entire main screen of Nashua City Hall notified me to be "Part of the solution".

127.    The Nashua campaign was now branding me as not being part of a solution, but *"highly*

*recommending"* vaccination in order to avoid wearing a face-mask, and I now got the message,

because this expressive label now upon me as an unvaccinated person, infers and in-turn

identifies me as a part of the problem.

128.    I found that; in order to enter a place of business that required either a vaccination or a

face-covering, my wearing a face-covering could implicate me as not being vaccinated, where

in-turn, those customers hostile to, whom they identify as "anti-vaxers", and with help from

---

[21] EXHIBIT 12 – City of Nashua website page, *Be Part of the Solution* Face Mask banner.

Defendant Sununu *later described*, have caused me unease and anxiety from harassment in past

encounters, with an apprehension and need to stay away from those particular businesses.

129.   During the June 9, 2021 City of Nashua DPHCS meeting, it was announced, that the *"I*

*am part of the solution"* campaign was started as a regional campaign.[22]

130.   Any campaign that suggests, advocates, or implies, that I am not part of a solution but an

inferred or silent part of a problem—regarding me not taking the COVID-19 vaccine, is

attacking my character and challenging my right to privacy, but also weakening and

circumventing the intended purpose of the State's *Medical Freedom in Immunizations Act*, RSA

141-C:1, because now the city has created a peer-pressure campaign.

131.   I submit there is no state interest in requesting or requiring me (through a city ordinance)

to receive a medical procedure in the form of a vaccination, because NH law RSA 141-C:1

already describes the state's position regarding vaccinations.

132.   The state has already exercised its police powers through a number of state emergency

decrees. The state has deemed these emergencies to be over, but both NH and Nashua continue

to exercise police powers that are designed to cancel existing state regulations, laws, and

freedoms, without requesting the state legislature to modify or change these laws.

133.   I submit there is no state interest in requesting or requiring me through a city ordinance to

disclose whether I have received a COVID-19 vaccination or not, because:

> 1. The Defendants (government) do not have the power under both State and federal
>
> laws, to request or require me, using any mechanism or scheme, to disclose my medical
>
> information to the public;

---

[22] See Exhibit 11, pg. 2, final bullet-point (bottom of page).

2. the Defendants have not produced or promulgated guidelines or requirements that

establish proven science-based protective measures;

3. the Defendants have not informed me of the dangers for using unapproved FDA

medical devices, that would provide comfort and security for me to wear a face-covering,

and,

4. the Nashua Defendants "interest" regarding vaccines has already been established in

state law, under RSA 141-C:1.

134.     Validating the *above-mentioned* city ordinance violations, the current federal Emergency

Use Authorization "EUA" must be regulated by the FDA, the current FDA requirements have

only authorized a specific type of N95 face-mask—discussed below in Count 2, Federal law,

Title 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III) of the Federal Food, Drug, and Cosmetic Act,

states the following about products granted emergency authorization usage:

> Individuals to whom the product is administered are informed—
>
> *(I) that the Secretary has authorized the emergency use of the product;*
>
> *(II) of the significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown; and*
>
> *(III) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.*

135.     Currently, the FDA has authorized only NIOSH-approved N-95 face-masks for use by

the general public, although the FDA considers this EUA as "non-binding".

136.     All non-NIOSH-approved N-95 face-masks are "investigational products" under an

Emergency Use Authorization ("EUA"). All non-N-95 face-masks are not approved products,

and are referred to in the *above* Title 21 law as "unapproved products", because these products

have not been fully tested and approved for use by the FDA. In this instance, the mask is the product.

137.    In-turn, this unapproved EUA would trigger federal law 21 CFR § 50.20 – General requirements for informed consent, and § 50.25 - Elements of informed consent.

138.    There are no indications of exemptions or alternatives within the Nashua ordinance that would provide an avenue for informed consent, that would allow me to decline the stated restriction before entering a business.

139.    Without presenting an offering for informed consent, as provided within Title 21 *above,* the Nashua ordinance has exposed all Nashua Defendants and Nashua businesses that are requiring face-masks to a Title 21 violation.

140.    Where the Nashua ordinance provides no consequences (enforcement clause) for not following the ordinance, the ordinance is unenforceable and must be deemed unconstitutional and deemed null, void, and terminated.

141.    I have a liberty interest under the Due Process Clause of the U.S. Fourteenth Amendment in refusing unwanted medical treatment as cited in the case of Jacobson v. Massachusetts, 197 U.S. 11, 2430,[23] pursuant to the NH *Medical Freedom in Immunizations Act,* yet I was and continue to be treated differently while condemned, confronted and criticized through Defendants Donchess, Wilshire and Consentino's continuing ordinance and campaign for not being vaccinated.

142.    I submit, the Nashua Defendants must leave the business decisions of the Nashua business community to Nashua businesses, other than fair-trade, land, and tax issues. Directing, guiding, or requiring a business to decide how my personal medical situation should be exposed

---

[23] Cruzan v. Director, Missouri Department of Health, (88-1503), 497 U.S. 261 at 2430 (1990)

or treated, I submit is a reckless and unreasonable action, and without consideration of my New

Hampshire medical freedoms as provided in State law, and in disregard of my freedom to

participate in commerce without fear of harassment or reprisal,

143.    and by requiring me wear unregulated and non-safety-tested medical face-masks, I

suffered and in certain situations continue to suffer mild to severe episodes of tachycardia and

other cardiac events, mild to severe headaches and weakness, and varying degrees of insomnia as

a result of the physical and psychological issues in dealing with a long recovery from an earlier

cardiac procedure, performed at the Massachusetts General Hospital.

144.    If a private business wants me to wear a mask, I submit, that is up to the business to

decide without being coerced from legislative action by the city or state that intrudes upon my

privacy and freedom to participate in commerce.

145.    Defendant Sununu has spoken publicly during many instances; that, businesses have a

right to decide whether they can require their employees to be vaccinated as a condition of

employment.

146.    This is in sharp contrast with the State's position and the position of Defendant Donchess

regarding their legislative and executive actions, which strong-arm and necessitate these

businesses to require medical face-coverings in place of vaccinations.[24]

147.    If a private business wants me to wear a mask, I submit, that is up to the business to

decide without being coerced from legislative action by the city or state that intrudes upon my

privacy and freedom to participate in commerce.

148.    If the Nashua Defendants believe there is such an emergency, then the Nashua

---

[24] Defendant Sununu joined a federal law suit that enjoined the Federal Government from imposing vaccines on workers, US Fifth Circuit Court, 21-60845), yet agrees that businesses should have the ability to require non-safety-tested and unregulated medical-device's (face-coverings) upon me.

Defendants should outline and declare the nature of the emergency, without using businesses as an instrument to harass me regarding my medical status.

149.    I therefore seek a Declaratory Judgment, followed by permanent injunctive relief, where the actions of the Nashua Defendants are unlawful and arbitrary, capricious, under color of state law and not in accordance with the stated purpose of NH law RSA §141-C:1; contrary to constitutional rights, powers, privileges and immunities, and in excess of statutory jurisdiction, authority or limitations; and that the face-covering as described here is unlawful, since it violates the Nashua Charter in requiring adherence to state and federal laws; the intended purpose of Articles 2b (Right of Privacy), and 29 (Suspension of Laws by Legislature Only), of the New Hampshire Constitution, and under the 9th and 10th Amendment to the U.S. Bill of Rights and Constitution and the 14th amendment to the U.S. Constitution.

150.    By not informing me of my right to decide whether to wear a medical face-mask, I suffered greatly during my recovery from a cardiac procedure, and continue to be harmed when unable to participate in commerce and associated harassment and when required to wear a face-covering medical device that extends beyond my health and safety as described in this complaint and my affidavit.

151.    Nashua Face-Covering Ordinance O-21-065 is in violation of State Law RSA 141-C:1 Medical Freedom in Immunizations Act, where the Nashua Defendants are currently requiring me to take a vaccine in place of wearing a face-covering, and must rescind this Nashua ordinance, immediately.

152.    Additionally, the Nashua Defendants are in violation of my federally-protected rights, when they require me to wear (FDA regulated) untested and non-regulated medical face-coverings, without providing me information on the hazards in wearing these devices, and

without freedom of choice in wearing these devices, in violation of 21 CFR §50.20 & §50.25, and 45 CFR Subpart A - Basic HHS Policy for Protection of Human Research Subjects.

153.   Customary international law applies directly to the United States and its agencies and Instrumentalities, including a norm that prohibits non-consensual human medical experimentation. Abdullahi v. Pfizer, 562 F.3d 163, 174-188 (2nd Cir. 2009).

154.   The Nashua Defendants must be enjoined from requiring me to wear any face-covering, without *bona fide* (certified) safety-testing, conducted by the federal agency having statutory authority, where this information is accessible to me regarding such safety-testing. NOTE: Safety testing does not constitute defective and unreliable peer review studies.

155.   In the absence of certified safety testing, and under federally-mandated 'informed consent' laws, I am free to decline any non-safety-tested and non-certified medica face-covering.

## COUNT II

### Declaratory and Injunctive Relief
Cessation of Amended Nashua Face-Covering Ordinance O-21-065.
(Nashua Defendants)
18 U.S. Code § 242 - Deprivation of rights under color of law.
45 CFR Subpart A - Basic HHS Policy for Protection of Human Research Subjects.
Article 1, Section 8, Clause 3 of the U.S. Constitution, (Dormant Commerce Clause)
9th & 10th Amendments to the U.S. Bill of Rights and Constitution
14th Amendment to the U.S. Constitution

156.   I adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

157.   Effective May 26, 2021, Defendant Donchess rescinded COVID-19 emergency ordinance numbers O-20-018 and O-20-029, and replaced them with Ordinance number O-21-065, with additional guidance.

158.   However, the additional guidance alluded to are actually in the form of concealed face-

covering requirements directed at public and private businesses, which are designed against my

freedoms to participate in commerce, and that uses public and private businesses as a means of

enforcement to this amended ordinance, where the amended ordinance incorporates no

enforcement provisions.

159.    Accordingly, the safety and regulatory policies for face-coverings are developed and

promulgated exclusively by the FDA.

160.    The FDA does not require public face-covering for COVID-19. There are no FDA

regulatory requirements or policies for the general public that currently require or mandate face-

coverings, where the latest revised FDA Enforcement Policy for Face Masks, Barrier Face

Coverings, Face Shields, Surgical Masks, and Respirators During the Coronavirus Disease

(COVID-19) Public Health Emergency, dated September 2021, contains on each page of their

12-page Guidance document: *Contains Nonbinding Recommendations*

161.    As the regulatory safety organization for these medical devices, the reasoning for this

"nonbinding" notice, is carefully detailed within my Affidavit of this complaint.

162.    As of November, 2017, the FDA has had a Memorandum of Understanding with the

CDC regarding face-coverings.[25] The "purpose" of this understanding was relative to the only

approved face-covering that can be used for non-medical use, which states:

    I. Purpose

> *This Memorandum of Understanding (MOU) between the Food and Drug
> Administration (FDA), acting through its Center for Devices and Radiological
> Health (CDRH), and the Centers for Disease Control and Prevention (CDC),
> acting through its National Institute for Occupational Safety and Health
> (NIOSH), National Personal Protective Technology Laboratory (NPPTL) (herein
> referred to as "the Agencies"), provides a framework for coordination and
> collaboration between the Agencies relating to their regulation of Surgical N95*

---

[25] EXHIBIT 13: Memorandum of Understanding Between the FDA/Centers for Devices & Radiological Health, and the CDC & Prevention (MOU 225-18-006).

> *Respirators and N95 Filtering Facepiece Respirators (FFRs)1 used in healthcare settings (herein collectively referred to as "N95s").*

163.    Accordingly, there is no MOU for any other face-covering between the FDA and the CDC, validating that the CDC does not have regulatory authority for the current face-covering recommendations they have been publishing in the form of 'guidance documents'.

164.    On October 14, 2021, defendant Consentino posted the following CDC notice on her EpiPath social media Facebook® https://www.facebook.com/epipathconsulting site:

> *Everyone—vaccinated or not—should continue to wear a mask indoors in public areas with a substantial or high level of community transmission. Learn more: https://covid.cdc.gov/covid-data-tracker/#county-view.*

165.    Defendant Consentino knew or should have known, that the CDC is not the federal agency that regulates, safety-tests, or approves face-covering devices, and for her to direct me to this CDC site, places me and other fellow Nashua friends into a false sense of safety and security in the protection of my health.

166.    Some-time in the Spring of 2020, defendant Consentino gave an interview to Peter Biello of New Hampshire Public Radio "NHPR". This interview was published on or around December 23, 2020.[26]

167.    During the-above NHPR interview and as the medical spokesperson for Nashua, Defendant Consentino advised me—*via her interview*—her belief, that the Nashua ordinance made a difference in my community, regarding the wearing of face-coverings and vaccinations, although the federal agency that regulates and safety-tests face-coverings and vaccinations (FDA) has not supported the effectiveness of face-coverings, where she relies-upon the CDC's non-regulated and scientifically unsupported guidance.

> *So, the [city's] mask ordinance enacted over the summertime - that has made a difference in regards to our community-based transmission. And then also, two,*

---

[26] EXHIBIT 14: NHPR Interview with Defendant Angela Consentino, Spring of 2020.

> *we have just recently changed our quarantine and isolation guidance from 14*
> *days to 10 days, which is based off of the new CDC guidance.*

168.    Accordingly, States within the U.S. that have no face-covering mandates, have

produced similar if not better results:

169.    On October 21, 2021, defendant Consentino published in her EpiPath social media

Facebook® site; not to believe everything you read that is coming from a scientist and

published in an academic journal, indicating her skepticism in peer-reviews:

> *It's so important to not believe everything you read - even if it's coming from a*
> *scientist and published in an academic journal! Remember to always look at scientific*
> *literature through a critical lens.* Facebook, 10-21-21 above.

170.    On October 8, 2021, defendant Consentino published in her EpiPath social media

Facebook® site; regarding her presenting on issues as a non-expert:

> *As an Epi (and as an adjunct professor), I find myself constantly creating and*
> *presenting on a variety of different topics - and sometimes I'm presenting on*
> *topics that I'm not an expert in. When I have to give a particularly difficult*
> *presentation, I find that the key to success is in preparation. I make my own*
> *slides, become extremely familiar with the content, anticipate audience questions,*
> *build engagement into my presentation, and then I have fun with it.*

171.    Nashua epidemiologist, defendant Cosentino's Massachusetts company (EpiPath) social

media Facebook® site, reveals her requirements and beliefs in the wearing of face-coverings

as designated through the CDC, and not from any NH or Nashua independent findings.

172.    Defendant Consentino's suggestion that the Nashua mask ordinance *"has made a*

*difference"* regarding the number of people infected with a described Covid-19, is misleading

and cannot be validated because of the unknown number of various Coronavirus-type infections,

where these infection results are caused by the CDC's unscientific PCR testing, revealed within

this complaint, and also taken with the number of additional causes shown within this complaint.

173.    N.H. RSA Section 49-C:14, Ordinances. Ordinances shall be published, compiled

and revised in such manner and at such times as the elected body shall determine.

174.    It is not the intent of §4. (Mayor and board of aldermen) of the Nashua Charter, or

under New Hampshire State law RSA Title I, Chapter 4, §4:45, II. (a) (State of Emergency

Declaration) to allow Nashua to maintain their face-covering declaration, via an off-and-on

switch, using legislation purporting a "public health emergency" in perpetuity, when the basis for

the face-covering ordinance was a State emergency that no longer exists.

175.    The Nashua Ordinance has no federal regulatory reasoning or support for requiring the

recommendations and hidden mandates for wearing face-coverings, other than being used as a

tool to support businesses that Nashua pushed *via ordinance* into requiring me to wear a face-

covering in the absence of receiving a COVID vaccination.

176.    It is my belief that this ordinance scheme validates; that Nashua is using private

businesses as their enforcement-arm for an otherwise unenforceable ordinance that requires

unregulated and non-safety-tested face-coverings.

*177.    New Hampshire State law RSA 21-P:35   II. (a) A state of emergency shall*

> *terminate automatically 21 days after its declaration unless it is renewed under
> the same procedures set forth in paragraph I of this section.*[27]

178.    However, through the current revised ordinance, the Nashua Defendants never terminated

their city emergency, which is currently ongoing, despite the tens of thousands attending

weekend televised baseball and football games, indoor professional hockey games, and active

shopping malls, all (not withstanding a fraction minority) not wearing face-coverings.

179.    In Home Building and Loan Association v. Blaisdell, 290 U.S. 398 (1934), the U.S.

---

[27] EXHIBIT 15: NH Section 4:45 State of Emergency Declaration; Powers

Supreme Court stated: "Whether an emergency exists upon which the continued operation of the law depends is always open to judicial inquiry." 290 U.S. at 442, citing Chastleton Corp. v. Sinclair, 264 U.S. 543 (1924).

180.    In Sinclair, the Supreme Court stated: *"A law depending upon the existence of emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change."* 264 U.S. at 547.

181.    Both Blaisdell and Sinclair are authorities that an emergency and the rules promulgated thereunder must end when the facts of the situation no longer support the continuation of the emergency.

182.    They also forbid this Court to merely assume the existence of a "public health emergency" based on the pronouncements of the Defendants. These authorities show that it is the duty of the court of first instance to grapple with this question and conduct an inquiry. *"[A] Court is not at liberty to shut its eyes to an obvious mistake when the validity of the law depends upon the truth of what of what is declared."* See above

183.    The Sinclair court instructed lower courts to inquire into the factual predicate underlying a declaration of emergency, where there appears to have been a change of circumstances: *"the facts should be gathered and weighed by the court of first instance and the evidence preserved for consideration by this Court if necessary."* 264 U.S. *above at* 549.

184.    I am seeking a Declaratory Judgment, followed by permanent injunctive relief where, the actions of the Nashua Defendants are unlawful and arbitrary, capricious, and not following a reasonable-type of 21-day state policy limitation found in New Hampshire State law RSA 21-P:35  II. (a), contrary to constitutional rights, powers, privileges and immunities, and in excess of statutory jurisdiction, authority or limitations; that the exigencies underlying the

41

"public health emergency" no longer exist; and that in the absence of a "public health emergency" the Defendants lack any reason to continue to authorize the emergency type ordinance against me that permits unregulated and non-safety-tested face-coverings.

185.    By not informing me of my right to decide whether to wear a medical face-mask, I suffered greatly during my recovery from a cardiac procedure, and continue to be harmed when unable to participate in commerce and associated harassment and when required to wear a face-covering medical device that extends beyond my health and safety endurance as described in this complaint and my affidavit.

186.    I reassert my claim regarding 'informed consent' as described in Count I.

187.    Face-Covering Ordinance O-21-065 is unconstitutional and must be revoked, instantly.

## COUNT III

### Injunctive Relief
### All Defendants
18 U.S. Code § 242 - Deprivation of rights under color of law.
42 U.S. Code § 1320d–6 & 7 - Right to Privacy of Medical Information
9th and 10th Amendments to the U.S. Bill of Rights and Constitution
14th Amendment to the U.S. Constitution

188.    I adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

189.    This is a claim where I am alleging my Fourteenth Amendment privacy right against compelled disclosure of medical information to the government, under the seminal case of Whalen v. Roe, 429 U.S. 589 (1977).

190.    On April 16, 2021, the State of New Hampshire, hereinafter "NH", statewide mask

mandate expired, and on June 11, 2021, the NH COVID State of Emergency ended. At this time,

Defendant Sununu left it up to the individual cities and towns to decide face-covering

requirements.

191.    However, these face-covering requirements cannot supersede state law, in-as-much as

Article 29 of the New Hampshire Constitution provides this authority to the legislature only:

> [Art.] 29. [Suspension of Laws by Legislature Only.] *The power of suspending the laws,*
> *or the execution of them, ought never to be exercised but by the legislature, or by*
> *authority derived therefrom, to be exercised in such particular cases only as the*
> *legislature shall expressly provide for.*

192.    On May 26, 2021, Nashua, NH, hereinafter "Nashua", COVID emergency ordinances,

numbers O-20-018 and O-20-029, were rescinded.

193.    These rescinded emergency ordinances were replaced with Amended Ordinance O-21-

065, hereinafter "the ordinance", that contained confusing and coercive guidelines and

requirements which directly affects me. The ordinance proclaimed to the citizens and businesses

of Nashua; *". . recommendations for Fully Vaccinated People . . are no longer required to wear*

*a face covering . . outdoors or indoors where business is conducted unless required by that*

*business, organization or worksite in Nashua."* Here, the government is notifying businesses that

it is permissible to act as there (government) agent in face-covering enforcement that includes

issues of my right to medical privacy.

194.    I had recognized that this Nashua ordinance was following an earlier published May 17th,

2021, New Hampshire Division of Public Health Services, Bureau of Infectious Disease Control

notice, entitled: *"NH Public Health Recommendations for People Who Are Fully Vaccinated*

*When Around Others from Outside the Household"*, that advised:

> *People who are unvaccinated or only partially vaccinated against COVID-19 should*
> *continue to wear face masks and physically distance when around other people indoors,*
> *and outdoors if unable to consistently maintain 6 feet of physical separation from others.*

195.    Nashua went even further, requiring these businesses little to no choice but to put in

place these requirements, citing guidance requirements from the Nashua Board of Health,

hereinafter "BOH", that go beyond a guidance. Nashua cited their BOA recommendations for

local businesses to establish their own policies and protocols with regard to face coverings, but

then contrary to this new policy, strongly urged that "essential businesses"[28], "at a minimum",

establish hours, processes or environments which outlined how and where "masks must be worn"

for the comfort and safety of vulnerable persons. This Nashua ordinance was now, again, a

mandate, requiring that, if business employees, at a minimum, must wear masks, customers must

too.

196.    Because the Nashua Defendants publicly proclaimed that they had rescinded the Nashua

mask mandate, they notified me that they (the Nashua Defendants) are now directing "private

businesses" (through new legislation) to enforce the wearing of face-coverings.

197.    Because of the difficulty for a business to determine a safety condition for who is

vulnerable and who is not, this section of the ordinance also leaves businesses with little choice

but to require me to wear a face-covering, causing confusion to a number of businesses.

198.    This modified Nashua Ordinance also warns; that their BOH was recommending

businesses "weigh the risks" of protecting me and their staff:

> If a business requires mask wearing, this would mean both "vaccinated and
> unvaccinated" people "must comply", because as at present, they would not have any
> universally accepted way to distinguish between vaccinated and unvaccinated.

This additional section of the ordinance also leaves a business no freedom or choice, but to

---

[28] *See* EXHIBIT 4: Exhibit A to Emergency Order 17.

require me as a customer to wear a face-covering, because the Defendants are using the

ordinance as an instrument to insert, what I submit is a business liability warning, to "weigh the

risks" of protecting me and staff.

199.     Under Defendant Sununu's now rescinded executive order #74, section 6, read:

> *A person who declines to wear a mask or cloth face covering because of a medical or developmental issue, or difficulty breathing, shall not be required to produce documentation, or other evidence, verifying the condition.*

However, this "breathing exemption" is not included in the Nashua ordinance.

200.     Businesses weigh risk each day. It's a part of commerce, but for a city ordinance to

require everyday businesses such as grocery stores or Macy's to evaluate the risk regarding a

consumer or customer like me to wear a medical device,[29] puts enforcement for face-coverings in

the untrained hands of businesses, because the ordinance does not offer an enforcement clause.

201.     This type of State burden-shifting upon businesses directly affects me, while opening the

        door

to a number of liabilities to Nashua commerce and me, including but not limited to, requiring a

business to determine the type and in-turn effectiveness of the face-covering I am required to

wear.

202.     I submit, under the 10th amendment to the U.S. constitution, only NH and/or the BOA

should be the legally-required entity to recommend the level of *bonafide* and proven medical

protection for the public-at-large, and the appropriate way of administering this protection for

me, and not requesting or requiring retail and wholesale businesses to weigh their own health and

liability risks that incorporate my level of face-covering by-way-of my vaccination status.

203.     Because of the confusion caused by the language in the revised Nashua ordinance, there

---

[29] Exhibits 1A and 1B

are a number of businesses that have chosen to comply only with those parts of the ordinance that provide special treatment for vaccinated people to enter without a face-covering, while penalizing me as an unvaccinated person to enter with a face-covering. This notification is accomplished by placing a variety of warning signs on the doors and windows of businesses, notifying me of face-covering requirements that are connected to my vaccination status.

204.    These vaccine/mask signs posted on most retail and wholesale businesses were not in place when "emergency" mandates were in place, because everyone, including me, were required to wear protective face-coverings. If I chose not to wear a face-covering, regardless of its capacity for protection, I would have been seen by the public-at-large and business owners as violating an all-inclusive mask-mandate. No illegal dissemination of medical information was obvious or noticeable, because everyone was equally under the same mandate restrictions.

205.    Because of an embarrassing situation that had taken place at the Pheasant Lane Mall in Nashua earlier in the declared pandemic,[30] I chose not to enter those businesses that strongly suggested or required me to wear a face-covering if not vaccinated. This choice to adhere to these warnings was provoked through fear of being publicly embarrassed again, and prevented me from doing business with these various retail and wholesale stores and businesses.

206.    Those businesses adhering to the government ordinance for "weighing the risks" and participating in face-covering requirements at a "minimum" for "essential businesses", in-turn are doing so because of governmental pressures which violate my right to privacy, because no healthcare emergency is declared that would require everyone to wear a face-covering.

207.    This favored treatment for vaccinated customers and patrons is designed against my

---

[30] Incident described in Plaintiff's Affidavit.

right to participate in commerce and against my privacy rights located within NH and federal

codes—regarding the Nashua requirement-by-ordinance for me to disclose medical information

(COVID vaccine status) contained in my medical records, which otherwise I would not want

disclosed.

208.    When Defendants Donchess and defendant Wilshire, approved and enacted Amended

Ordinance no O-21-065, they each knew or should have known that, under color of state law,

their actions violated State privacy regulations, where New Hampshire guarantees my right to

medical privacy of my patient medical records,[31] and under the federal Health Insurance

Portability and Accountability Act (HIPAA), 42 U.S. Cand ode § 1320d–6 [32] - Effect on State

law, and privacy of my medical information is also guaranteed as follows:

> 'WRONGFUL DISCLOSURE OF INDIVIDUALLY IDENTIFIABLE HEALTH
> INFORMATION'
>
> *SEC. 1177. (a) OFFENSE.—A person who knowingly and in violation of this part— '(1)
> uses or causes to be used a unique health identifier;*
>
> *'(2) obtains individually identifiable health information relating to an individual; or*
>
> *'(3) discloses individually identifiable health information to another person, shall be
> punished as provided in subsection (b). '*
>
> *(b) PENALTIES.—A person described in subsection (a) shall— (1) be fined not more
> than $50,000, imprisoned not more than 1 year, or both;*

209.    It is my contention; because New Hampshire is not a "home rule" state, and Nashua has

only the powers the state legislature has expressly given it, the ordinance conflicts with the NH

state regulatory law, *footnote 4,* that protects my medical privacy, and is preempted by this state

---

[31] EXHIBIT 16: New Hampshire Revised Statutes, Title X - PUBLIC HEALTH, Chapter 141-C - COMMUNICABLE
DISEASE - NH Rev Stat §141-C:2, XII-a. (2015) – Protected Health Information, and §141-C:10, I. Any protected
health information provided to or acquired by the department under this chapter shall be released only with the
informed, written consent of the individual . . " Emphasis supplied

[32] EXHIBIT 17: State Regulations - New Hampshire Administrative Code, He-P 812.19 - Patient Records, He -
Department of Health and Human Services PART He-P 812 - RULES FOR AMBULATORY SURGICAL CENTERS (He-P
812.19 (e), (f) and (g).

law, the is ordinance unenforceable, along with the fact that there are no enforcement provisions contained in the ordinance.

210.    Additionally, Laboratory testing in the United States is comprehensively regulated by the federal Clinical Laboratory Improvement Amendments (CLIA). Unlike HIPAA, which generally permits a covered entity U.S.C 42 C.F.R. §493.1291(f), requiring:

> *Except as provided in §493.1291(l), test results must be released only to authorized persons and, if applicable, the persons responsible for using the test results and the laboratory that initially requested the test.*

211.    The intent of these state and federal medical privacy laws is to protect my medical information from becoming public without my consent. For Nashua to create an ordinance that weakens and circumvents these laws is in contradiction of my medical privacy rights. Information regarding my medical COVID vaccination status is personal and private to me and other than my disclosure within this controversy, I have not and chose not to publicize or distribute my medical information for public review, that is otherwise protected from public knowledge under both state and federal laws.

212.    As a known consequence of the ordinance, Defendants Donchess and defendant Wilshire knowingly and willingly created an illegal business practice or at the least a coercive business condition that was and continues to be emotionally and physically harmful to me.

213.    Defendants Donchess and defendant Wilshire have and continue to use the ordinance to institute an unfair and illegal government law (the ordinance) that encourages, and illegally uses businesses, while using confusing and coercive language to violate my right to privacy via making known my vaccination (medical) information, that is revealed when I am wearing a face-covering.

214.    The ordinance reveals the minimum face-covering requirements for essential businesses,

and where masks must be worn, and this is where my conscience leads me, regardless of the risk to me or my name. Public and private wholesale and retail businesses (other than medical or hospital facilities) do not have my permission or the right to my medical status or my medical information, and should not be requiring me to reveal it by my use or non-use of a medical (mask) device.

215.    In as much as I practice the principals to lead by example, I have not been one to follow the crowd or answer for those people or businesses that cheat or choose not to follow the requirements as published in the ordinance. The government does not have the legal authority to request or require me to disclose my medical information through the use of a medical practice (wearing a face-mask) to these public and private businesses, against my personal autonomy and in matters relating to my own medical care—when the government has not declared a state of emergency.

216.    During a State of Emergency, all people are required to perform or adhere to the policies equally, providing no preferential treatment to any particular group, and no one is given an opportunity or indication of their neighbor's medical condition because of this equal treatment.

217.    I therefore seek injunctive relief, where the actions of the Defendants are unlawful and arbitrary, capricious, under color of state law and not in accordance with New Hampshire Administrative Code, He-P 812.19 - Patient Records, He - Department of Health and Human Services PART He-P 812 - Rules For Ambulatory Surgical Centers (He-P 812.19 (e), (f) and (g), contrary to constitutional rights, powers, privileges and immunities, and in excess of statutory jurisdiction, authority or limitations; and that face coverings as described here is unlawful, since it violates the intended purpose of federal Health Insurance Portability and Accountability Act

(HIPAA), 42 USC 1320d–6, §1177 —*above*, guaranteed privacy of my medical information, and

U.S.C 42 C.F.R. §493.1291(f), *above*— of the federal Clinical Laboratory Improvement

Amendments (CLIA) as stated above, and under the protections as promulgated within NH Rev

Stat §141-C:2, XII-a.

218.    By not informing me of my right to decide whether to wear a medical device face-

covering, I suffered greatly during my recovery from a cardiac procedure, and continue to be

harmed when unable to participate in commerce and associated harassment and when required to

wear a face-covering medical device that extends beyond my health and safety as described in

this complaint and my affidavit.

219.    Because of the violations I have described, the described Defendants are currently in

violation of state privacy laws, under color of state law, and protected by the New Hampshire

Bill of Rights, Article 2b (Right of Privacy), and the 14th Amendment to the U.S. Constitution.

220.    State constitutional protections are also guaranteed me under the NH Bill of Rights,

Article 4 (Right of Conscience), and Article 6 (Morality and Piety), and of the 9th and 10th

Amendments to the U.S. Bill of Rights and Constitution and associated common law.

**COUNT IV**

**Declaratory and Injunctive Relief**
**Defendant Sununu and Defendant Shibinette**
Amending Constitution by Contract – U.S. Amendments 9 & 10
Violation Title 45, Part 75, Sub-Part A, §75.326 Procurements by states, and §75.327,
General procurement standards
45 CFR Subpart A - Basic HHS Policy for Protection of Human Research Subjects.
Articles 1, 7 and 8 of the NH Bill of Rights and Constitution
9th and 10th Amendments to the U.S. Bill of Rights and Constitution
14th Amendment to the U.S. Constitution

221.    I adopt all of the preceding paragraphs and incorporate them by reference, as if

fully set forth herein.

222. Accordingly, a Meet-and-Greet meeting and personal conversation between Defendant Sununu and me, in Exeter, NH, around October 5, 2021, regarding my objection to his approaching endorsement of an anticipated $27-million-dollar contract grant. In particular, details of this conversation will not be outlined in this complaint. These types of events are anticipated as friendly territory, and I do not believe in breaching the trust and confidence these meetings are designed for. I will only aver that; shortly after shaking hands with Defendant Sununu, he and I were in a very brief mutual disagreement, with others present, regarding the enforcement language used on page 17 of the described federal contract grant.

223. On March 26, 2021, Defendant Sununu issued executive order #87, that includes the following:

> *WHEREAS, the ongoing vaccination efforts of the State have given many Granite-Staters a sense of optimism, State Epidemiologist, Dr. Benjamin Chan, advises that adherence to mitigation strategies, <u>including the continued use of face coverings</u>, will aid the State in the coming weeks and months as vaccination efforts continue; and*

> *WHEREAS, the New Hampshire Division of Public Health has advised that <u>wearing a cloth face covering</u> is an effective tool for slowing the spread of COVID-19.*

224. On December 11, 2020, Defendant Sununu was quoted by Jaclyn Peiser of the Washington Post, on the failure of NH Senate President's untimely passing from not wearing a face-covering:

> *At a news conference Thursday, New Hampshire Republican Gov. Chris Sununu lauded Hinch as a "tireless leader" and described him as a close friend, calling his death a "cautionary tale" about the costs of failing to wear a mask. Sununu lashed out at other Republican legislators for flouting face masks at large gatherings.*

225. Defendant Sununu has a demonstrated a lack conscience to those practicing there

constitutional freedoms and self-independence, and has continuously displayed an unfortunate politically-bias against friends whom do not wear face-coverings, exhibited more after the unfortunate loss of our friend.[33]—*above*

226.    The face-covering claims within defendant Sununu's executive order #87 are inaccurate and unsupported as revealed by the FDA; the only federal agency authorized to regulate and safety-test face-coverings, while his comments are also shown to be scientifically untrue and misleading, as described within the engineering and science offerings in this complaint and accompanying affidavit.

227.    A significant number of unfairly-described "anti-maskers" are indoor air quality (IAQ); air-quality & safety, and air-filtration specialists, whom are 'not against the wearing of face-masks' in hospital and medical-facility settings for bacteria-related illnesses and other hospital and medical-field-related borne pathogens, and in industry for their specific rating-values, design, and intended use, as described within the OSHA regulations.

228.    Defendant Sununu's 'anti-masker' label, which I have taken personally, is a rather unfair political portrayal and attack, and not based upon my character or associates of mine who strongly believe in the science and engineering of air-filtration and protected mask-wearing. of, FDA policies, and IAQ science.

229.    Defendant Sununu's attack further revealed his unfamiliarity of government FDA Safety Policies and the science of IAQ engineering.

230.    On November 11, 2021, I emailed a letter to members of the Fiscal Committee of the

---

[33] EXHIBIT 18: *"New Hampshire governor blasts anti-maskers after House speaker dies: 'Don't act like a bunch of children'"*, dated December 20, 2020.

NH General Court,[34] " . . *warning of my objection to a controversial agenda item headed your way for the Fiscal Committee; the $22M COVID-19 Vaccination [contract]grant.* "

231.   The letter was intended to get their attention regarding the potential consequences of approving this federal contract grant. However, the Fiscal Committee nonetheless approved the above-mentioned contract grant, in a 6-4 vote.

232.   The vote to approve this contract grant Friday followed the NH Executive Council turnaround-vote from an earlier denial on the subject two weeks earlier, which caught me and other opponents off-guard, because the $22-million-dollar contract grant was a late agenda item and had no previous notice.

233.   In a 6-4 vote, the six Fiscal Committee members that voted for the above-mentioned contract grant; Karen Umberger – Committee Chair, Chuck Morse, Peter Leishman, Tracy Emerick, Lou D'Allesandro, and Cindy Rosenwald, are named as non-party Defendants in my complaint.

234.   Fiscal Committee member, Bob Giuda, read a long statement opposing the $22-M federal funding, warning that liberty and freedom were at stake.

235.   I am alleging, Defendant Sununu violated the Guidance for Grants and Agreements, located within the U.S. Office of Management and Budget, 2 CFR parts 25, 170, 183, and 200, by relinquishing state sovereignty rights through contract with the federal government.

236.   In particular, Title 45, Sub-title A, Sub-chapter A, Part §75, Subpart A - §75.2 *Definitions, of the Uniform Administrative Requirements, Cost Principals, and Audit Requirements for HHS Awards*[35], where:

> ***Contract means*** *a legal instrument by which a non-Federal entity purchases property or services needed to carry out the project or program under a federal award. The*

---

[34] EXHIBIT 19:  One of the e-mails sent to members of the Fiscal Committee of the NH General Court.
[35] Last Amended October 18, 2021

*term as used in this part does not include a legal instrument, even if the non-Federal entity considers it a contract, when the substance of the transaction meets the definition of a Federal award or subaward (see Subaward).*[36] Emphasis supplies

237.    In this controversy, Defendant Sununu signed a Contract Grant that does more than simply receive services from the U.S. Government, but requires all Defendants to <u>comply with existing and/or future directives and guidance</u> from the U.S. Secretary of US-DHHS regarding control of the spread of COVID-19; to coordinate COVID-19 patient care with the Federal Government, regardless of the individual's home jurisdiction and/or appropriate public health measures (e.g., social distancing, home isolation); and to assist the United States Government (not for the U.S. Government assisting the State) in the implementation and enforcement of federal orders related to quarantine and isolation.

238.    Accordingly, these *above* contract terms and conditions are in direct conflict with Title 45, Part 75, Sub-Part A, §75.326 Procurements by states, and §75.327, General procurement standards.[37]

239.    Accordingly, two of the following federal grants received since 2020, incorporate an agreement between the State of New Hampshire and the Federal Government, that rescinded NH State sovereignty to a point that eliminated the State to control my COVID-19 health and security. These contract grants include:

> - Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 (P.L.116-123); - Coronavirus Aid, Relief, and Economic Security Act, 2020 (the "CARES Act") (P.L. 116-136);
>
> - Paycheck Protection Program and Health Care Enhancement Act (P.L. 116- 139);

---

[36] EXHIBIT 19A:  Title 45, Sub-title A, Sub-chapter A, Part §75, Subpart A - §75.2
[37] EXHIBIT 20:  Title 45, Part 75, Sub-Part A, §75.326 Procurements by states, and §75.327, General procurement standards

- Consolidated Appropriations Act and the Coronavirus Response and Relief Supplement Appropriations Act, 2021 (P.L. 116-260)

- American Rescue Plan of 2021 (P.L. 117-2)

240.    Specifically, (Item #19 on August 18 and Items # 9A and #9C on September 15) and two items containing the language (# 9B and #9D).

241.    I am asserting this claim pursuant to INS v. Chadha, 462 U.S. 919 (1983):

> *Federalism's limitations are not therefore a matter of rights belonging only to the States. In a proper case, a litigant may challenge a law as enacted in contravention of federalism, just as injured individuals may challenge actions that transgress, e.g., separation-of-powers limitations, see, e.g., INS v. Chadha, 462 U. S. 919. The claim need not depend on the vicarious assertion of a State's constitutional interests, even if those interests are also implicated. Pp. 8–12.*

242.    In a recent November, 2021 State sovereignty case, where the State of Louisiana was successful in obtaining a preliminary injunction against the U.S. Executive branch of government, *State of Missouri, et al vs. Joseph R. Biden, Jr., el al, Case No. 4:21-cv-01329,* stay pending appeal denied, the court stated:

> *"If the executive branch is allowed to usurp the power of the legislative branch to make laws, two of the three powers conferred by our constitution would be in same hands." —above*

243.    This particular controversy was initiated when I had recognized in a contract grant; a law enforcement clause, as a <u>requirement</u> to receive a federal grant related to the federal government's exclusive oversight of COVID-19 health and safety vaccine distribution.

244.    Why is a law *enforcement clause* necessary as a *term and condition*, when Defendant Sununu controls the NH-DHHU, and the State's health and safety, using the police powers of the State, with access, if necessary, to the NH State Police and authority to call upon the National Guard.

245.    Additionally, under 44 CFR § 206.35 - Requests for emergency declarations, when an

incident occurs or threatens to occur in NH, which would not qualify under the definition of a major disaster, Defendant Sununu may request that the U.S. President declare an emergency to receive additional funding or assistance from the Federal Emergence Management Agency, or "FEMA".

246.    This contract *term and condition* I am referencing is number 3, and states the following:

> *3) assist the United States Government in the implementation and enforcement of federal orders related to quarantine and isolation.*

247.    New Hampshire policy requires; that quarantine and isolation are health and safety functions controlled by the State. In New Hampshire, the Commissioner of the Department of Health and Human Services (DHHS) has "primary authority" for ordering isolation and quarantine for persons within the State, though the requests are usually made by an official in the Division of Public Health Services at NH-DHHS because they investigate infectious disease outbreaks.

248.    Should a NH citizen refuse to be put into isolation or quarantine, procedures exist under New Hampshire law that allows health officials to compel someone to cooperate with an order of isolation or quarantine or to face legal actions if there is sufficient threat to the public's health and safety, and it is the State's law enforcement that enforces these actions.

249.    The CDC can also be notified by New Hampshire authorities and in national health emergencies, and has the CDC has the power to detain, medically examine, or conditionally release persons suspected of carrying certain communicable diseases within the United States. These are all established and current policies—*above*, not requiring a separate *term and condition* in order to receive contract grant funding.

250.    Creating *terms and conditions* that contractually puts the U.S. government ahead of

State regulations and policy for quarantine and isolation of me, and where the same U.S.

government can direct Defendant Sununu to have New Hampshire law enforcement quarantine

and isolate me without following the State's primary authority for quarantine and isolation,

transfers and amends NH police powers of the 10th amendment by contract.

251.    Another conflict, using contract law, the U.S. government can now require me and NH

residents into isolation or quarantine without any emergency being declared under these contract

grants.

252.    For instance, the federal government can produce an agency or executive order that

requires all senior citizens in the U.S. (like me) to wear a face-covering or be vaccinated, and

those not complying, to be quarantined or isolated from the population. In-turn, the contract

grant, as written, can be used to require Defendant Sununu to *assist the United States*

*Government in the implementation and enforcement of (these) federal orders related to*

*quarantine and isolation.*

253.    Because the contract grant language restricts states from suing on violations that are the

subject of a pending federal enforcement action, *see below,* my due process rights under the U.S.

14th amendment along with other constitutional liberty interests would be violated, pending the

filing of an expensive federal court action for relief.

254.    Accordingly, the elimination of the *above-stated* State sovereignty, did compel and

continues to compel Defendant Sununu to act as a U.S. government agent, and by extension,

requiring, coercing and harassing me to wear an unregulated and non-safety-tested face-

covering, in violation of Articles 7 and 8 of the NH Bill of Rights and Constitution and the 9th

and 10th amendments to the Bill of Rights and constitutions of the U.S.

255.    The Contract with the U.S. Government

1.  On October 8, 2021, the attorney general "AG" for the State of NH, responded to a request from Defendant Sununu in a memorandum, entitled, <u>Federal COVID-19 Grant Award Fund Requirements and the Contract.</u>[38]

2.  In the final paragraph of page 3, the AG states: *"[L]egislation enacted pursuant to the spending power is much in the nature of a contract: <u>in return for federal funds, the States agree to comply with federally imposed conditions.</u>*

Accordingly, it is common knowledge in business, a contract is when parties agree to a deal in which each of them gives something up and the other gets something in return. An important step in analyzing a contract is knowing the terms and "who" is liable under the contract. Here, the liable party is the State, and its' performance on behalf of the U.S. Government. Non-performance would be a breach of the contract.

The AG concludes in his memorandum within paragraph 2 above, by stating: *The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepted the terms of the 'contract.'*

256.    This page 3 paragraph *above* appears to indicate, that defendant Sununu, may or could challenge in the future, that he may not have been completely aware of what he signed?

257.    The AG does demonstrate, in favor of my position, that the quoted language is limited to guidance and directives *"as applicable to the award"*. The contract outlines, among other things, the following ambiguous *terms and conditions* of the award:

> *1) comply[ing] with existing and/or future directives and guidance from the Secretary [U.S.] (DHHS) regarding control of the spread of COVID-19;*
>
> *2) in consultation and coordination with [U.S.] HHS, provide, commensurate with the condition of the individual, COVID-19 patient care regardless of the individual's home*

---

[38] EXHIBIT 21: Memorandum, To: Governor Christopher Sununu, From: John Formella, Attorney General Date: October 8, 2021, re: Federal COVID-19 Grant Award Fund Requirements.

*jurisdiction and/or appropriate public health measures (e.g., social distancing, home isolation); and*

*3) assist the United States Government in the implementation and enforcement of federal orders related to quarantine and isolation.*

258.  All of the *above* terms and conditions, I submit, violate the Federal Grant and Cooperative Agreement Act, passed in 1977, set out to guide government agencies in their use of Federal funds and set out to guide grant contracts.

259.  Under 41 CFR § 102-36.40 - Definitions apply:

*Grant means a type of assistance award and a legal instrument which permits a federal agency to transfer money, property, services or other things of value to a grantee <u>when no substantial involvement is anticipated between the agency and the recipient</u> during the performance of the contemplated activity.* Emphasis supplied

223.  When reading the latest contract grant signed by Defendant Sununu, it <u>does</u> appear as though the U.S. government <u>does have</u> substantial involvement.

224.  One piece in particular; assisting the federal Government with the States law enforcement alone, because States have no inherent power to enforce federal statutory law, Pennsylvania v. Porter, 659 F.2d 306, 317 (3d Cir. 1981).

225.  This common law indicates, that New Hampshire will be contractually working under the direction of the federal government, superseding the State's 10th amendment sovereignty, should the U.S. government arbitrarily decide that COVID-19 requires mandatory face-coverings and/or mandatory vaccinations upon senior citizens like me.

226.  <u>Most importantly</u>, most of the provisions of the *stated* contract grant also require state enforcers to notify the relevant federal agency in advance of filing a complaint, permit the federal agency to intervene in the case, and restrict states from suing on violations that are the subject of a pending federal enforcement action.

227.  Accordingly, it is my contention, that the State's continued excessive and unreasonable

enforcement of a number of COVID-19 related activities, is the result of Defendant Sununu

standing idle and blindfolded, while cities and towns place my rights (as described in this

complaint), into the hands of private businesses and school administrators, both are through a

coercive and ambiguous city ordinance, that steers liberty protections away from the people.

228.    Defendant Sununu's 'standby' mode is exactly what the terms and conditions outlined

within the *above-mentioned* government contract grants expect, when I consider the current

unregulated and non-tested requirements of the CDC followed by the Nashua Defendants, and

Defendant Chan's silence regarding the improper and unscientific PCR testing throughout New

Hampshire.

229.    Cited in the Bond case, *above,* the court went on to say:

> *Federalism also protects the liberty of all persons within a State by ensuring that*
> *laws enacted in excess of delegated governmental power cannot direct or control*
> *their actions. See ibid. By denying any one government complete jurisdiction over*
> *all the concerns of public life, federalism protects the liberty of the individual*
> *from arbitrary power.* Gregory v. Ashcroft, 501 U. S. 452, 458 (1991) cited in
> Bond *below.*

230.    The Government Accountability Office "GAO" has a number of suspension and

debarment functions that protect the U.S. government from contract grant recipients that do not

use grant-funding in accordance with its intended use, and the intended use here is to provide

financial assistance for the State to provide COVID-19 related State functions.

231.    These GAO protections for the federal government make the enforcement clauses within

the subject contract grants completely unnecessary.

232.    It is my contention, if Defendant Sununu believes he would not have received federal

funding from the federal contract grants in question, without allowing the 'power grab' of the State's police powers and sovereignty, then I would suggest curing the three terms and conditions with the following language:

1. *The State of New Hampshire agrees to follow all applicable federal regulatory codes in the performance of this contract grant;*

2. *and the NH-DHHS shall cooperate and work with the U.S. DHHS in as much as such cooperation does not conflict with relevant State and Federal regulations and laws, and,*

3. *where the State of New Hampshire fully intends to follow-through and honor the COVID-19 health and safety programs as outlined within these contract grants, with only the removal of the three-described enforcement clauses, these contract grants shall otherwise remain in place.*

233.    Within the above-mentioned Memorandum, the NH AG continuously reminds Defendant Sununu; that the document ". . *only requires that [they] adhere to the guidance's and directives specific to the awards they have accepted."* Yet, it is the language within the guidance and directives that I have an issue with.

234.    When the NH AG advises in the Memorandum that; *"[t]he language does not mean that grant award recipients are bound to any and all future directives of the HHS Secretary.",* it is my understanding that the Defendants are bound to the guidance and directives in the contract grant which transfer New Hampshire's, and in-turn my COVID-19 oversight to the U.S. government.

235.    The NH AG cites the U.S. Supreme court; that requires *"grant conditions must be unambiguous and are viewed similar to contract."* This is my point exactly. When I conduct business, (I'm now retired), the method for interpreting a document is potentially a two-step process where a judge decides the question of law (does an issue of ambiguity exist?), and a jury decides the question of fact (how should the contract be interpreted?). The judge makes a

determination before the question goes to the jury, and the law inquiry is conducted without the jury being present. If the judge declares a provision in the contract to be ambiguous, then the question moves on to the jury, where it is decided as a question of fact. See City of Detroit v. Porath, 271 Mich. 42, (1935); S.C. Gray, Inc. v. Ford Motor Co., 92 Mich. App. 789 (1979).

236.    My contention, is that the language in the federal statutes, above, do not meet the contract grant policies of Title 45 *above*. After reading the NH AG's Memorandum, he too believes Defendant Sununu must ". . *adhere to the guidance's and directives specific to the awards they have accepted.*" When the language in a contract is in disputed, it *"is subject to two or more reasonable interpretations or is inconsistent on its face, the contract is ambiguous, and a factual development is necessary to determine the intent . . " of the CDC and parties."* Petovello v. Murray, 139 Mich. App. 639, 642 (1984). In this controversy, the intent of the CDC and Defendant Sununu would need to be established.

237.    When Defendant Sununu and Defendant Shibinette conducted actions, through a contract with the CDC, which relinquished a number of my rights for the State to oversee my COVID-19 medical treatment, they contracted with a federal agency (CDC) that does not have safety and regulatory oversight of face-masks, thereby giving away my right to address the State regarding face-covering, a medical device that is critical to my health and safety as described in this complaint and my affidavit.

238.    I therefore seek injunctive relief, where the actions of the Defendants are unlawful and arbitrary, capricious, under color of state law and not in accordance with New Hampshire and because of the violations of Title 45, Sub-title A, Sub-chapter A, Part §75, Subpart A - §75.2, and Title 45, Part 75, Sub-Part A, §75.326 Procurements by states, and §75.327, General

procurement standards, along with those policies I have described within Title 2 of this complaint.

239.    I am requesting the court declare Defendant Sununu is in violation of my rights under the 9th and 10th amendments to the U.S., by Bill of Rights and Constitution; the 14th amendment to the U.S. Constitution, which are also afforded me in State rights under Articles 1, 7 and 8 of the NH Bill of Rights and Constitution, under color of state law, by:

> Terminating the federal contract grants as described *above* in this complaint, or in the alternative, revoke and amend these federal contract grants which eliminates the enforcement clauses as written, in accordance with my Prayer for Relief.

240.    Article 4 (Right of Conscience), and Article 6 (Morality and Piety), and of the 9th and 10th Amendments to the U.S. Bill of Rights and Constitution and associated common law.

## COUNT V

**Injunctive Relief**
**Defendant Chan**
Medical Malpractice, NH law RSA 507-E:1
**All Defendants**
Violation of 21 CFR §50.20 & §50.25- Informed consent
45 CFR Subpart A - Basic HHS Policy for Protection of Human Research Subjects.
Articles 7 and 8 of the NH Bill of Rights and Constitution
9th and 10th Amendments to the U.S. Bill of Rights and Constitution
14th Amendment to the U.S. Constitution

241.    I adopt all of the preceding paragraphs and incorporate them by reference, as if fully set forth herein.

242.    Defendant Chan was and has been aware; that there is no scientific evidence in existence of a naturally occurring SARS-Cov-2 or COVID-19 contagion or specimen to use for PCR testing, and has been aware that no such natural specimen has been isolated as a naturally-occurring contagion to use for purposes of human diagnostic testing.

243.    Defendants Sununu, Shibinette, and Chan have been and are currently aware; that the

63

specimen currently used in all New Hampshire for PCR testing, to identify a virus branded as COVID-19, was made from a computer-generated code using gene sequencing technologies, and not using recognized science.

244.     Because COVID-19 has not been naturally isolated as a new or novel contagion, but rather is a synthetically created test-specimen, developed with funding from the CDC in an attempt to mimic the symptoms (by computer) of the pneumonia-type illness found in China, the PCR test performance used in the United States is affected, because the CDC has recognized, that the epidemiology and clinical spectrum of infection caused by 2019-nCoV is not fully known, along with the following reasons.

  o   Detection of viral RNA may not indicate the presence of infectious virus or that 2019-nCoV is the causative agent for clinical symptoms.

  o   The performance of this test has not been established for monitoring treatment of 2019-nCoV infection.

  o   The performance of this test has not been established for screening of blood or blood products for the presence of 2019-nCoV.

245.     Pursuant to the above-mentioned unknowns, all Defendants did not inform me that the medical procedures conducted on me through PCR testing was experimental.

246.     The United States Court of Appeals for the First Circuit explained, "[A] public official 'acts as "trustee for the citizens and the [s]tate . . . and thus owes the normal fiduciary duties of a trustee, e.g., honesty and loyalty" to them.'" United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996) (quoting United States v. Silvano, 812 F.2d 754, 759 (1st Cir. 1987)).   The court then concluded that "[w]hen the conduct of a government official is involved, 'the affirmative duty to disclose material information arises out of [the] official's fiduciary relationship to [the public].'" quoting Silvano at 812 F.2d at 758.

247.     Additionally, Defendant Chan; individually and through the State, misdiagnosed the

disease identified as COVID-19, failed to properly diagnose a medical disease identified as

COVID-19, and failed to provide me with the appropriate treatment, where, among other

remedies, therapeutic treatments were and currently are available.

248.    Accordingly, the viral fragment(s) that was identified in 2019 as a "novel" virus and

named SARS CoV-2 (COVID-19), was acknowledged by the creators of the SARS-Cov-2 name,

as using an unreliable PCR test-setting level (above 34) that is a level scientifically known to

identify numerous numbers of viral fragments, including those within the coronavirus family,

which include but are not limited to the common cold.

249.    It is for this reason; the unreliable practice conducted in Wuhan, China, has been reported

to have identified, among other contagions, one of a number of previously identified and

patented coronavirus strains.

250.    Pursuant to this unreliable and unscientific practice and procedure, hereinafter "unreliable

practice"; the World Health Organization, hereinafter the "W.H.O."; the U.S. National Institutes

of Health, hereinafter "NIH"; the U.S. Department of Health and Human Services, hereinafter

"US-DHHS", and the CDC, was and continues to be unable to provide evidence; that the

pathogen identified in Wuhan, China—they named SARS-CoV-2 and later CoVID-19—is a

virus.

251.    Nevertheless, this same unreliable (PCR) practice was introduced by the U.S. Federal

Government to the U.S. medical community within the individual States to use in the same

unreliable and non-scientific fashion, to identify a pathogen named CoVID-19 that was never

previously identified as a "novel" viral pathogen (virus).

252.    Shortly thereafter, on December 14, 2020, almost an entire year after COVID-19 testing

had begun, the W.H.O. announced it had received information concerning elevated risks for false

SARS-CoV-2 results when testing specimens using real-time polymerase chain reaction (RT-

PCR) for detection of SARS-CoV-2 (COVID-19).

253.     The W.H.O. alert was a warning regarding a "problem" with a wholly arbitrary cycling

process, which means that many cycles during this PCR testing were required in order to amplify

and ultimately detect a virus, any virus. In a majority of circumstances, the distinction between

background noise and actual presence of a target coronavirus was difficult to ascertain, making

this testing protocol unreliable.

254.     The New Hampshire Department of Health and Human Services, hereinafter "NH-

DHHS", has been aware of this type of unreliable testing, because approximately thirteen years

earlier, in 2007 there was over 1000 false RT-PCR test results in Lebanon, New Hampshire,

where the New York Times cited a prescient quote from Dr. Elizabeth Talbot, deputy state

epidemiologist for the New Hampshire Department of Health and Human Services (NHDHHS),

who said:

> *Those who run our public institutions have allowed history to repeat itself.*
> *At the head of the line of incompetence and malfeasance is the UN itself.*

255.     Notwithstanding, today and continuing, the NH-DHHS has elected to willingly and

recklessly re-introduce this same unreliable PCR testing protocol to the New Hampshire public

at large, that continues to harm me and my friends.

256.     Later, recognizing the W.H.O. warning and the CDC ending this PCR testing, effective

December 31, 2021, the NH-DHHS has elected to continue its reckless behavior by thoughtlessly

following the CDC's date of December 31, 2021 for ending RT-PCR testing in New Hampshire.

The United States Funded the Development and Patented the SARS-Coronavirus.

257.     The purpose of the following disclosure, is to expose SARS-Coronavirus and a number of

coronaviruses have been exposed in the global community for over twenty-years.

258.    This exposure has allowed an unknown number of the world's population to develop T-

Cell immunity:

> *An intriguing new study of these memory T cells suggests they might protect some people newly infected with SARS-CoV-2 by remembering past encounters with other human coronaviruses. This might potentially explain why some people seem to fend off the virus and may be less susceptible to becoming severely ill with COVID-19.* National Institutes of Health (NIH) Director's Blog, July 28, 2020.[39]

259.    On January 28, 2000, the University of North Carolina, Chapel Hill, hereinafter

"UNCCH", filed for United States Patent protection for an infectious *replication defective*

*coronavirus* that was specifically designed to target human lung epithelium (human tissue),

which is also a description of Severe Acute Respiratory Syndrome, or SARS, and on April 16,

2002, U.S. Patent number 7,279,327, was issued to the UNCCH for this created lung-attacking

virus.

260.    Patent number 7,279,327,[40] lays out in specific "gene sequencing",[41] the fact that

the NIH, the CDC, and the NIAID[42] knew, as evidenced by Patent number 7,776,521,[43] that the

spike protein and other elements of what we have come to know as SARS is not a natural

progression of the coronavirus, but the U.S. Patents reveal that the SARS pathogen was not only

engineered, but could be synthetically modified in the laboratory using just gene sequencing

technologies, taking computer code and turning it into a pathogen or an intermediate of the

pathogen, evidence that this is not a naturally recuring pathogen, and similar to COVID-19.

---

[39] EXHIBIT 26 (Late entry) National Institutes of Health (NIH) Director's Blog, July 28, 2020.
LINK: https://directorsblog.nih.gov/2020/07/28/immune-t-cells-may-offer-lasting-protection-against-covid-19/
And LINK: https://www.duke-nus.edu.sg/directory/detail/antonio-bertoletti
[40] EXHIBIT 22: United States Patent number 7,279,327 (2007)
[41] Identified as the ACE receptor, the ACE-2 binding-domain, the S1 Spike Protein, and other elements.
[42] The NIAID is one of the 27 institutes and centers that make up the National Institutes of Health (NIH), an agency of the United States Department of Health and Human Services (HHS).
    EXHIBIT  23: Withdrawn – Final legal review showed U.S. Patent may be NSA-CIA related.
[43] EXHIIBIT 24: United States Patent number 7.,776,521 (2010) – (SARS-CoV) Coronavirus isolated from humans.

261.     I am alleging; that Patent number 7,279,327, contains the specific "gene sequence"

that has questionably been reported as the original SARS pathogen and indicated as such by the

International Committee on Taxonomy of Viruses of the World Health Organization "ICTV".

262.     SARS-CoV-1, a National Institute of Allergy and Infectious Diseases Biodefense

Category C priority pathogen, was said to have been developed in the biodefense and related

programs division of the NIAID https://www.niaid.nih.gov/research/biodefense .

263.     Evidence will reveal during trial, that the ICTV reviewed this gene sequence against

Approximately 120 patent records that were available from the Spring of 2020.[44]

264.     It has been alleged after a review of the above-mentioned "gene sequence" by M-CAM,[45]

that the evidence reveals there have been no "gene sequences" attributed to be "novel" of

coronavirus since 1999, and there have not been shown any "novel" coronavirus Patent activity

since 1999.

265.     This evidence is validated by the Law of Nature Doctrine in 35 U.S.C. §101,[46] where:

Claims directed to or encompassing a human organism are "ineligible" (and always have been).

In other words, you cannot Patent a natural organism, which, upon information and belief, makes

---

[44] EXHIBIT 25:  Patent listing from M·CAM International LLC, based on a series of reviews of patent literature
derived from references found in: A novel bat coronavirus reveals natural insertions at the S1/S2 2 cleavage site of
the Spike protein and a possible recombinant 3 origin of HCoV-19, and The Proximal Origin of SARS-CoV-2 .
[45] www.m-cam.com Mr. David Martin of M-CAM is a Bio-Weapons and Global Security expert, and has been asked
to monitor biological and chemical weapons treaty violations. Mr. Martin is uniquely qualified with expertise in the
analysis of the instant subject matter, and one of the Plaintiff's U.S. Patents can be found and interpreted through
Mr. Martin's company. Mr. Martin has worked on many defense and intelligence projects and investigations, from
bringing down the biggest tax frauds in U.S. history to cleaning up war zones.
[46] In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig., 774 F.3d 755, (Fed. Cir. 2014) - involved
comparing two sequences of DNA, one target DNA sequence and one wild-type sequence, to detect alterations;
the CAFC held that those claims were directed to a patent-ineligible "abstract mental process" of comparison of
the two sequences. According to the court, the common denominator for these cases was that the claims at issue
were "directed to" a patent-ineligible concept "when they amounted to nothing more than observing or
identifying the ineligible concept itself." Rapid Lit., Appeal No. 15-1570 at 9.

SARS man-made. Section 33(a) of the America Invents Act 2011. See also Animals –

Patentability, 1077 Off. Gaz. Pat. Office 24 (April 21, 1987)

266.     Because this is the identical computer-generated "gene sequence" with minor variances

used from 1999 to 2020, not wearing a mask today, I submit is no more or less dangerous than

not wearing a mask within the past eighteen years.

The Science of SARS-Coronavirus

267.     Reported in the earlier-described February 20, 2020 New England Journal of Medicine,

hereinafter "2020-NEJM", COVID-19 was introduced in an original article, entitled: "A Novel

Coronavirus from Patients with Pneumonia in China, 2019".[47]

268.     The novel findings disclosed within this NEJM report—indicate: COVID-19 was given

its name in 2019 after following testing protocols that were not recognized within the scientific

community;

- that RT-PCR testing was performed using a higher-level of sensitivity that would ordinarily void the testing;[48]
- that this unusual testing protocol was used to accomplish a visualization and detection of a new human coronavirus that can possibly elude identification by traditional approaches;
- where the traditional scientific standard for this type of study is recognized within this NEJM report and in microbiology science as the Koch postulates,
- and that further development of accurate and rapid methods to identify unknown respiratory pathogens would still be needed after the publication of this study:

> "Positive results were also obtained with use of a real-time RT-PCR assay for
> RNA targeting to a consensus RdRp region of pan β-CoV (although the cycle
> threshold value was higher than 34 for detected samples).[49] Virus isolation from
> the clinical specimens was performed with human airway epithelial cells and
> Vero E6 and Huh-7 cell lines. The alleged isolated virus[50] was named 2019-
> nCoV." —2020-NEJM, EXHIBIT 7.

---

[47] See EXHIBIT 7, *above.*
[48] NEJM, earlier described
[49] NEJM, earlier described
[50] The isolation referenced was performed using non-recognized and un-scientific methods, where the study does not fulfill Koch's Postulates.

*NOTE: Please see underlined text to understand this was not a detection level recognized within the scientific community.*

"Our study showed that initial propagation of human respiratory secretions onto human airway epithelial cell cultures, followed by transmission electron microscopy and whole genome sequencing of culture supernatant, was successfully <u>used for visualization and detection of new human coronavirus that can possibly elude identification by **traditional approaches**</u>." —2020-*NEJM, EXHIBIT 7 Discussion, par 3.*

"Further development of accurate and rapid methods to identify unknown respiratory pathogens is still needed." —2020-*NEJM, EXHIBIT 7 Discussion, par 4.*

"<u>Although our study does not fulfill Koch's postulates</u>, our analyses provide evidence implicating 2019-nCoV in the Wuhan outbreak." —2020-*NEJM, EXHIBIT 7 Discussion, par 5.*

269.    The above-mentioned NEJM describes how the scientists arrived at the idea of COVID-19: they took lung fluid samples and extracted RNA from them using the PCR test, and acknowledges that the testing of coronavirus failed Koch's postulates.

270.    Accordingly, the reason "further development" was needed, is because these microbiologists recognized that the Koch Postulates was not fulfilled within the above-named study. The reason why the Koch Postulates was not fulfilled is because SARS is not a natural-progression of the Coronavirus family—the pathogen if exists, did not naturally occur, as evidenced by US Patent 7,279,327.

271.    The SARS-Cov-2 or pathogen identified as COVID-19, could not be 'isolated' as a "novel" pathogen or contagion using a human sample, using a normal RT-PCR setting, but required the PCR machine to amplify the sample(s) at such a high level that any form of coronavirus strain would have been detected from a human sample.

272.    SARS-Coronavirus as a circulating pathogen inside science's viral model is not novel—is not new, and when corroborated with U.S. Patents, has not been new in decades-past, when face masks were not a requirement.

273.    Defendant Chan, knew or should have known; that his intentional deception and reckless

behaviors in his duties to the State of New Hampshire and as a medical professional, has and

continues to affect my safety and health, by ignoring the regulatory knowledge and his legal

medical obligations described in this complaint, all of which have unnecessarily coerced and

required me to wear a face-covering.

274.    Defendant Chan, knew or should have known; that his intentional deception and reckless

behaviors in his duties, were required to disclose the above-mentioned science and information

in accordance with 21 CFR §50.20 & §50.25- Informed consent, where I had a right to know of

the reason and consequences of the PCR medical procedures performed upon me, and the

reasons and consequences in why I am required to wear a medical face-covering.

<u>State Defendants Were Warned by the U.S. Government of Their State Obligations</u>

275.    "[A]n agency literally has no power to act, let alone pre-empt the validly enacted
        legislation of a sovereign State, unless and until Congress confers power upon it." La.
        Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 357 (1986).

276.    On December 13, 2018, the CDC published a legal document to be used by its' state and

federal clients, entitled: *The CDC Field Epidemiology Manual, Legal Considerations.*[51]

277.    As a federal agency, this legal document mentioned no safeguards or remedies that

protect the people, but was specifically written to promote federal CDC programs and objectives

directed to the States by using its State's 'police powers' found within the tenth amendment to

the US Constitution.

278.    Nonetheless, page 4 of this 10-page CDC legal document makes clear to the States,

including New Hampshire, the following:

        *"Federal officials have limited authority to initiate epidemiologic investigations. In fact,
        many CDC authorities are permissive rather than compulsory; thus, CDC's involvement*

---

[51] EXHIBIT 27:  10-page CDC Legal Manual.

*in state and local public health investigations usually is intended to assist the state or local investigator rather than exercise a specific federal authority."*

279.    Here, the CDC, an operating division of the US-DHHS, is reminding the State of New Hampshire, and the Defendants herein, of their independent obligation to examine their own epidemiologic investigations, which in this case impacts the efficacy of their PCR testing and whether a face-covering or other medical or non-medical device is useful, needed or required within the New Hampshire jurisdiction.

280.    Additionally, the *above* legal manual provides a reminder of the State's 10th amendment Obligations, while the CDC does not adhere to their own legal advice when crafting contract grants as earlier described.

281.    I therefore seek injunctive relief, where the actions of the Defendant Chan have been and currently are unlawful and arbitrary, capricious, under color of state law and not in accordance with New Hampshire law and U.S. federal laws and those protected by the U.S. Bill of Rights and U.S. Constitution. Because of the violations I have described, Defendant Chan has been and is currently engaged in wholesale medical malpractice, where Defendant Chan intentionally failed to properly diagnose and medically prognose safe and effective remedies and alternatives for face-covering while I was recovering from a cardiac medical procedure, and where Defendant Chan continues to use false and misleading federal jurisdiction(s) and non-science-related information that is untrue and misleading to justify his requiring me as a citizen of New Hampshire to wear a face-covering.

282.    Specifically, extended periods of face-mask wearing caused, and in certain situations continues to cause me mild to severe tachycardia and other cardiac events, mild to severe headaches and weakness.

283.    Additionally, in supporting Defendant Chan's medical malpractice, all Defendants have

maintained a code of silence in keeping from me and in-turn the public at large, information that would allow, approve or authorize me to decide whether I want to wear a face-covering (medical device) or not, in violation of 21 CFR §50.20 & §50.25- Informed consent, and 45 CFR Subpart A - Basic HHS Policy for Protection of Human Research Subjects.

284.    and by not informing me of my right to decide, I suffered greatly during my recovery from a cardiac procedure as earlier described, and continue to be harmed when unable to participate in commerce and associated harassment and when required to wear a medical face-covering device that extends beyond my health and safety as described in this complaint and my affidavit.

285.    I reassert my claim regarding 'informed consent' as described in Counts I and IV.

286.    I assert the 9th and 10th Amendments to the U.S. Bill of Rights and constitution and 14th Amendment to the U.S. Constitution.

**CONCLUSION**

287.    I adopt Count V in its entirety and incorporate by reference to all prior claims as if fully set forth herein.

288.    One of the teachings I was trained in as an engineering professional, was the effects of cognitive distortions. Because of the many dangerous situations that can be encountered in my profession, it was a requirement in certain engineering certifications. Proof was always required to determine the safety of a specific electrical or mechanical device.

289.    Labeling a person, such as Defendant Sununu labeling professionals like me as an anti-vaxxer, *(see Exhibit 18)*, is a cognitive distortion, in which people reduce themselves or others to a single, typically negative, characteristic, like a "liar" or "cheat." Rather than viewing the person's behavior objectively, there is a tendency to globally label the person in a derogatory

manner. As a result, any information that does not support the label is filtered out. Making a broad assumption about a person based on an isolated behavior or event, I have been trained is almost always inaccurate.

290.    Overgeneralization is a related cognitive distortion that involves drawing overbroad conclusions based on limited information. People may reach a conclusion based on one or two experiences, then see patterns where they do not exist and incorrectly draw sweeping conclusions about unrelated events. As an engineer, when safety issues are in question, I cannot follow a government regulation that does not have regulatory oversight of the safety question, just as the CDC should not be followed as the regulatory authority for the safety of medical devices, in this case, face-coverings, which are regulated by the FDA.

291.    An article on cognitive distortions, by Vinay Prasad, MD, MPH, August 17, 2021, wrote an article, entitled: *"COVID-19 cases are climbing and sanity is declining. Here are seven cognitive distortions I routinely see when it comes to talking about SARS-CoV-2[52]. One of the doctor's paragraphs explained the following:

> *". . . if you introduce pandemic restrictions that have never or rarely been implemented before -- travel bans, school and business closures, mask mandates, and military enforced lockdowns (as in Australia) -- it is inevitable some smart people will feel the harms outweigh the benefits, and equally inevitable that other smart people will feel we aren't doing enough. In these cases, having a forum to debate the ideas is not both-sidesing, but rather the legitimate purpose of media and universities."*

292.    The physical and psychological trials and harms I have encountered and continue to encounter, are a result of the Defendants not adhering to the same state and federal policies that I am required to follow.

293.    The above-described claims have and continue to cause me a number of physical and

---

[52] EXHIBIT 29: MedPage Today – Seven Cognitive Distortions.

psychological harms.

## VI.  PRAYER FOR RELIEF

WHERFORE, I respectfully request the court; to order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, and specific performance, and finding that the Plaintiff has and continues to suffer irreparable harm, has a likelihood of success on the merits, that the balance of hardships favors the Plaintiff and that it is in the public interest to grant such declaratory, temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiff, and as outlined within the following relief sought:

(A)     Declare that; in the absence of a *bona fide* state of emergency declared by the Governor of New Hampshire; that the Nashua, NH Ordinance number O-21-065 contains no enforcement clause, is unenforceable, and in violation of the U.S. Commerce Clause, making the ordinance unlawful, null, void and terminated.

(B)     Declare that; New Hampshire RSA §141-C:1-a, *Medical Freedom in Immunizations* law, prohibits all Defendants, from requiring public and private businesses, to require anyone to be vaccinated in order for the public (for me) to conduct or participate in commerce;

that all Defendants are enjoined in any current or future policies and enforcement, that requires, guides or coerces businesses in proposing, offering, or suggesting such vaccine entry requirements against the vaccine freedom provision of New Hampshire RSA §141-C:1-a.

(C)     Declare that; the CDC-PCR testing procedure used by the Defendants in New Hampshire (Exhibit 9), is ineffective and not suitable for determining whether a test-subject or patient has been infected by a contagion;

and that the Defendants are enjoined from using PCR or RT-PCR testing for wholesale public testing in the State of New Hampshire.

(D)     Declare that; all Defendants are required under 42 U.S. Code § 1320d–6 & 7 - Right to Privacy of Medical Information, and constitutionally are required to protect the plaintiff from businesses that propose, offer, or adopt policies that can cause the plaintiff to expose or represent his medical condition to the public,

and that all Defendants are enjoined from promoting, suggesting, or requiring public or private businesses to use signage or printed advertisements to promote vaccinations if not vaccinated, or face-coverings if vaccinated.

(E)     Declare that; under FDA policy 21 U.S. Code § 331, chapter III - Prohibited acts, of the Food, Drug, and Cosmetics Act, face-coverings are developed, safety-tested and regulated exclusively by the FDA, not the CDC; that there are no FDA regulatory requirements or policies for the general public that currently require or mandate face-coverings; that without a *bona fide* emergency declared by the Governor of New

Hampshire, the Defendants cannot continue to require the wearing of face-coverings in perpetuity, without FDA safety-testing and science-based evidence of an identified contagion, and that any continued mandating or requiring of medical face-coverings, violates the Plaintiff's 14th amendment rights to the U.S. constitution, and Articles 1, 2b, and 7 of the New Hampshire Bill of Rights.

(F)   Declare that; Defendant Sununu violated the law on Guidance for Grants and Agreements, 2 CFR parts 25, 170, 183, and 200; and that with or without such violation, Defendant Sununu unlawfully and unconstitutionally relinquished the Plaintiff's state sovereignty rights through contract, in an unlawful partnership with the federal government, against the plaintiff's protected rights of the 9th and 10th amendments to the US Bill of Rights and US Constitution;

that these enforcement clauses are located within the following Contract Grants: Federal government contract Grant item #19 on August 18th of 2021, and items # 9A and #9C on September 15th, 2021, and items # 9B and #9D, within the following contract grants:

- Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 (P.L.116-123);
- Coronavirus Aid, Relief, and Economic Security Act, 2020 (the "CARES Act") (P.L. 116-136);
- Paycheck Protection Program and Health Care Enhancement Act (P.L. 116-139);
- Consolidated Appropriations Act and the Coronavirus Response and Relief Supplement Appropriations Act, 2021 (P.L. 116-260)
- American Rescue Plan of 2021 (P.L. 117-2)

And that the three (3) enforcement clauses located at page 54, paragraph 241, are unlawful, null, void and terminated, or in the alternative, revoked and revised or amended, as follows:

Proposed Cure by the Plaintiff:

*1      The State of New Hampshire agrees to follow all applicable federal regulatory codes in the performance of this contract grant;*

*2.     and the NH-DHHS shall cooperate and work with the U.S. DHHS in as much as such cooperation does not conflict with relevant State and Federal regulations and laws, and*

*3.     where the State of New Hampshire fully intends to follow-through and honor the COVID-19 health and safety programs as outlined within these contract grants, and with only the removal of the three-described enforcement clauses, these contract grants shall otherwise remain in full force and effect.*

(G)   Declare that; the Nashua Defendants face-covering policies, guidelines, requirements, and mandates, are unsafe.

Enjoined the Defendants from requiring me to wear any face-covering, without *bona fide* (certified) FDA safety-testing, conducted by the federal agency having statutory authority for medical device safety-testing, and to have this safety-testing information accessible to me regarding the results of this safety-testing, and in the absence of *certified* and regulated safety testing, under federally-mandated 'informed consent' laws, I will have the opportunity to decline any non-certified medical face-covering device, and

That all Defendants have failed to meet the requirements of 45 CFR Part 46 for the protection of human subjects in medical experimentation, and 45 CFR Subpart A - Basic HHS Policy for Protection of Human Research Subjects;

(H)   Enjoin all Defendants from declaring, requiring, or mandating any further face-covering requirements, until the present controversy has been resolved, where the Plaintiff believes that the Defendants will attempt legislative and/or executive face-covering actions in an attempt to complicate and circumvent this controversy.

(I)   Permit the Plaintiff to amend this complaint should new claims of relief be needed from the Defendants actions after receiving this complaint; to include newly-discovered (additional) factual information, and/or to address alleged deficiencies the defendants may raise in a motion to dismiss.

(J)   Allow the Plaintiff reasonable time to seek counsel for filing injunctive relief.

(K)   The plaintiff requests recovery of all attorney fees, pursuant to, among other remedies, 42 U.S.C. §1988, thereby enabling the pursuit of meritorious claims.

(L)   Award Plaintiffs such other and additional relief as the Court deems fair and just.

## VII.  JURY DEMAND

I request a jury trial on all issues so triable, including without limitation the quantum of damages.

Date: December 13, 2021

_____
Wayne R. Saya, Sr.

77

*In propria persona*
24 Cadogan Way
Nashua, New Hampshire
03062
571-220-3344
waynesaya2@gmail.com

# CERTIFICATE OF SERVICE

I, Wayne P. Saya, Sr., of 24 Cadogan Way, Nashua, New Hampshire, Plaintiff, *pro se*, have caused to deliver the Plaintiff's Complaint; Exhibits to Complaint; Plaintiff's Affidavit; Plaintiff's Exhibits to the Affidavit; and Motion for Extension of Time to File for Injunctive Relief, documents to the following Defendants:

- James W. Donchess
- Lori Wilshire
- Angela Consentino
- Chris Sununu
- Lori Shibinette
- Benjamin P. Chan

Service has been made by hand *via* US District Court form AO 398 (Rev. 01/09), or by-way-of the county Sheriff's department.

SWORN TO UNDER PAINS AND PENALTIES OF PERJURY this 14th day of December, 2021.

Wayne P. Saya, *pro se*
Plaintiff
24 Cadogan Way
Nashua, NH 03062
571-220-3344 direct
wayne.saya@yahoo.com